RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

MARCUS BLAIR,

        *Defendant-Appellant.*

Nos. 06-6036/6037

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
Nos. 04-00088, 04-00178—Thomas A. Varlan, District Judge.

Argued: October 31, 2007

Decided and Filed: May 2, 2008

Before: DAUGHTREY and GILMAN, Circuit Judges; EDMUNDS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Jonathan A. Moffatt, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Tracee Plowell, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Jonathan A. Moffatt, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Tracee Plowell, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

---

## OPINION

---

    NANCY G. EDMUNDS, District Judge. Defendant-appellant Marcus Blair appeals the district court's denial of his motion to dismiss the indictment and his motion to suppress. Blair was indicted on a federal firearm charge and entered into a plea agreement with the government. Later, Blair was indicted on a federal drug charge that stemmed from a traffic stop. Blair filed a motion to dismiss the drug indictment, claiming that it violated the plea agreement in the firearm case. Blair also filed a motion to suppress the evidence seized during the traffic stop. The district court denied both motions. For the reasons set forth below, we REVERSE the district court's denial of Blair's

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

motion to suppress and VACATE Blair's sentence in the firearm case. This result makes it unnecessary for us to reach the plea agreement issue.

## I.        Factual and Procedural Background

On June 15, 2004, Blair was indicted in the Eastern District of Tennessee for possession of a firearm and ammunition by a person dishonorably discharged from the military, 18 U.S.C. § 922(g)(6). Blair made his initial appearance on July 19, 2004, when a Pretrial Services Report was disclosed to the parties. The Report included Blair's criminal history and reflected that he had a case pending in the Knox County Courts from a March 25, 2004 arrest for "Possession of a Schedule II Controlled Substance for Resale - Crack Cocaine." The Report did not include any details of the incident.

On September 8, 2004, Blair entered into a plea agreement with the United States and pleaded guilty to the firearm charge. The plea agreement contained the following two provisions:

> 12.        The United States agrees that this plea agreement constitutes the full disposition of the known non-tax federal charges within the Eastern District of Tennessee.

> 13.        The parties further agree that this plea agreement constitutes the full and complete agreement and understanding between the parties concerning the Defendant's guilty plea to the above-referenced charge, and that there are no other agreements, promises, undertakings, or understanding between the Defendant and the United States.

On October 28, 2004, the Presentence Investigation Report was disclosed to the parties. The Report contained a description of the pending Knox County drug case that included the amount of drugs Blair allegedly possessed: 68 grams. Blair's sentencing hearing was scheduled for December 6, 2004. On the morning of December 6, Blair's counsel was informed that the federal government would seek an indictment on the pending Knox County drug case. The sentencing hearing was adjourned, and Blair was indicted for the drug offense the next day, December 7, 2004, under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

The drug indictment stemmed from a traffic stop of Blair on March 25, 2004. That evening, two Knoxville Police Officers, Joshua Munday and Jeff Holmes, were conducting surveillance on a local residence on Bishop Street. The officers had been partners for three years, and both were members of the Community Response Team, a task force dedicated to combating prostitution and narcotics. Due to numerous complaints to the Knoxville Police Department about drug-trafficking at the residence, Officer Holmes had initiated a "problem solving kit" directed at the house. This led the Department to focus special attention on the house, including undercover surveillance and increased patrols. According to the Officers' testimony, the house was located in a high-crime area.

On the night of the stop, Officer Munday was working in an undercover capacity. This was a routine part of his job, during which he often would make hand-to-hand drug purchases. Officer Munday was dressed in plainclothes and watched the residence from an undercover police vehicle parked in a driveway approximately four houses down on Bishop Street. He used binoculars to aid his surveillance, the street was lit by street lights, and nothing blocked his view of the house.

At approximately 10:35 p.m., Officer Munday saw an older model Chevy Caprice stop in front of the house. A man, later identified by Officer Munday as Blair, exited the vehicle and began talking with the house's owner. Although Officer Munday knew Blair from a previous encounter, he could not recognize Blair from his vantage point. Fifteen to twenty minutes later, Officer Munday saw the two engage in what he believed was a hand-to-hand drug transaction. Despite this,

Officer Munday did not believe that he had probable cause to make an arrest because he could not see the items being exchanged. Officer Munday then watched Blair return to his vehicle, leave the house, and roll through a stop sign at the intersection of Bishop and Sycamore. Officer Munday testified that he used his Nextel cell phone's walkie-talkie function to inform Officer Holmes of the possible drug transaction and the stop sign violation. Officer Munday did not instruct Officer Holmes to stop Blair.

During this time, Officer Holmes was located around the corner on Sycamore Street. Officer Holmes was in uniform and in a patrol car equipped with a video and audio recording system. The entire traffic stop was recorded. From his vantage point, Officer Holmes could not see the suspect house on Bishop Street, nor could he see Blair's vehicle in front of the house.

Officer Holmes learned from Officer Munday that a vehicle had left the suspect house. A short time later, Officer Holmes saw Blair's car approach from the direction of the suspect house on Bishop Street. Although Officer Holmes was not sure that this was the vehicle to which Officer Munday had referred, he pulled behind and began to follow Blair's car. After approximately twenty seconds, Officer Holmes pulled Blair over. Officer Holmes informed Blair that he was stopped for a "tag-light" (*i.e.*, a license plate light) violation. Officer Holmes collected Blair's license and returned to the patrol car to run a records check. During this time, Officer Holmes observed that Blair was "a little fidgety" and was reaching underneath the seats of his vehicle. After a short delay, Officer Holmes received information that Blair's license was valid and that Blair had no outstanding warrants. (Video, 22:45:40.) Officer Holmes's testimony is contradictory regarding what happened next.

On direct examination, Officer Holmes first testified that immediately after he learned that Blair's license was valid, he was informed by Officer Munday that Blair had engaged in a hand-to-hand transaction at the house and had rolled through the stop sign at Bishop and Sycamore. Later on direct, however, Officer Holmes testified that he did not learn this information until approximately 22:49:37 on the videotape, four minutes after Blair's license came back valid. During cross-examination, Officer Holmes again testified that he learned of the possible hand-to-hand transaction immediately after the license check. The video evidence does not resolve this discrepancy.

From his position near the house, Officer Munday heard Blair's name over the radio. He informed Officer Holmes that he previously had encountered Blair, at which time Blair had possessed an assault rifle and attempted to flee. At this point, Officer Holmes asked Officer Munday to come to the scene to verify that the vehicle was the one Officer Munday saw at the house.

Officer Holmes then approached Blair's vehicle and asked for permission to search the car. (Video, 22:47:40.) Blair refused. Officer Holmes told Blair that he was not under arrest, then stated that the area was known for drugs and that he had reason to believe Blair possessed narcotics. (*Id.* at 22:48:15.) Officer Holmes said that he would call a canine unit to the scene if Blair would not consent to a search. (*Id.* at 22:48:35.) When Blair refused consent, Officer Holmes called for a canine unit. (*Id.* at 22:49:00.) Officer Holmes returned to his car, and Blair yelled to him to inquire why he had been pulled over; Officer Holmes replied, "Tag-light." Officer Holmes again approached Blair's car to explain the violation, and Blair continued to question why he had been stopped. Officer Holmes testified that during this time, Blair was reaching underneath the seats and toward his ankle area. Officer Holmes instructed Blair to stop reaching, backed away from the car, and returned to his patrol car. Shortly after, Officer Holmes called for backup. (*Id.* at 22:52:15.)

Officer Holmes testified that during this time, Blair appeared more nervous than is usual for a traffic stop. Blair began to exit his vehicle and asked if he could check his tag-light, which caused Officer Holmes to believe Blair was going to flee. Officer Holmes exited his patrol car and told

Blair that he could check the light "in a second." At this point, Officer Holmes returned to his patrol car and turned off the lights illuminating Blair's car. (*Id.* at 22:54:20.) Officer Holmes testified that he thought he saw the tag-light come on during the stop, and he wanted to confirm his observation. The video shows that Blair's tag-light was operating; however, even with the light on, Officer Holmes testified that he could not read Blair's license plate from a distance of ten feet.

Near this time, Officer Munday arrived on the scene and identified Blair's vehicle as the one he witnessed at the suspect house.[1] At 22:58:15, a backup unit arrived on the scene. At 22:58:50, a second backup unit arrived. Blair again questioned the reason for the stop. Officers Holmes, Munday, and two other uniformed officers approached the car. Officer Holmes proceeded to explain that a canine unit was en route and that Blair would be free to go if the canine did not alert on his vehicle. He also explained that if the canine did alert on the vehicle, the officers would have grounds for a search. (*Id.* at 23:01:15.)

The canine unit arrived on the scene at 23:02:28. Officer Holmes asked Blair to exit the vehicle so the canine could examine the car. When Blair exited the vehicle, he began to reach into his pockets. The officers ordered him to stop, had Blair place his hands on his vehicle, and performed a pat down search of Blair. (*Id.* at 23:02:55.) Officer Holmes felt a large lump in Blair's pant leg and, upon moving the pant leg, a large baggie filled with several small baggies fell to the ground. The baggies contained a substance Officer Holmes believed to be crack cocaine. At this point, the officers took Blair into custody. (*Id.* at 23:03:30.)

On December 7, 2004, Blair was federally indicted on drug charges. On January 10, 2005, Blair filed a motion to dismiss the indictment, claiming that it violated the plea agreement in the firearm case. The matter was referred to a magistrate judge, who issued a report and recommendation that denied Blair's motion to dismiss. The magistrate judge found that the language in the plea agreement was unambiguous and that the United States had not breached the agreement. Blair objected to the magistrate judge's report and recommendation. The district court overruled Blair's objection, accepted in whole the report and recommendation, and denied Blair's motion to dismiss the indictment. Because the district court found this to be a close case, it granted Blair twenty days to withdraw his guilty plea in the firearm case. Blair did not withdraw his plea.

On January 10, 2005, Blair also filed a motion to suppress the evidence seized as a result of the traffic stop. Blair argued that the stop was not supported by probable cause that a traffic violation had occurred or reasonable suspicion that criminal activity was afoot, and that he was unjustifiably detained after the purpose of the traffic stop was completed. The matter was referred to a magistrate judge, who recommended that Blair's motion be denied. The magistrate judge found that Officer Holmes had probable cause to stop Blair on the basis of a tag-light violation (but not on the basis of a stop sign violation), that Officer Holmes had reasonable suspicion that Blair was engaged in drug activity, and that Officer Holmes's suspicion justified the length of the detention. Blair objected to the report and recommendation. The district court overruled Blair's objections, adopted in whole the report and recommendation, and denied Blair's motion to suppress.

On April 4, 2006, Blair entered into a conditional plea agreement with the United States. Blair pleaded guilty to the drug charge and reserved his right to appeal the district court's denial of his motions to dismiss and to suppress. Blair was sentenced for both offenses on July 17, 2006. Blair received concurrent sentences of 120 months for the firearm charge and 121 months for the drug charge. Judgment was entered in both cases on July 31, 2006. This timely appeal followed.

---

[1] The video goes blank at 22:55:01; during this time, both officers were reviewing the videotape to see if Blair had rolled through the stop sign at Bishop and Sycamore. The video resumes at 22:57:04.

## II.      Jurisdiction

The district court had jurisdiction over this case under 18 U.S.C. § 3231.  This Court has jurisdiction over Blair's timely appeal under 28 U.S.C. § 1291.

## III.     Discussion

Blair's appeal rests on two grounds.  First, he claims that the indictment in the drug case violated his plea agreement in the firearm case.  Second, he argues that the traffic stop violated the Fourth Amendment and that all evidence seized as a result must be suppressed.  We will address Blair's Fourth Amendment argument first.

### A.      Motion to Suppress

This Court reviews the district court's decision on a motion to suppress under two complementary standards.  We review the district court's findings of fact for clear error and its conclusions of law *de novo*.  *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004) (citing *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000)).  A factual finding is clearly erroneous "when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (internal quotation marks omitted)).  Whether a search and seizure was reasonable under the Fourth Amendment is a question of law. *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003) (citing *United States v. Harris*, 255 F.3d 288, 291 (6th Cir. 2001); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 371 (6th Cir. 1998)).  Because the district court denied Blair's motion to suppress, we review all evidence in the light most favorable to the government. *United States v. Long,* 464 F.3d 569, 572 (6th Cir. 2006) (citation omitted).

An ordinary traffic stop by a police officer is a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  Accordingly, any evidence seized during an illegal traffic stop must be suppressed as "fruits of the poisonous tree." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).  This circuit has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation. *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004).[2]  The district court found that Officer Holmes's stop of Blair was justified under both tests.  On appeal, Blair argues that the district court erred because: 1) the traffic stop was not supported by probable cause, 2) the traffic stop was not supported by reasonable suspicion of ongoing criminal activity, and 3) Officer Holmes unjustifiably extended the scope of the stop beyond that necessary to complete its purpose.  We accept Blair's second and third arguments.  Accordingly, the decision of the district court is REVERSED.

#### 1.      Probable Cause to Stop Car

A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred. *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (quoting

---

[2]Whether the police may stop a vehicle based on mere reasonable suspicion of a civil traffic violation is the subject of a conflict in our case law. *Compare Weaver v. Shadoan*, 340 F.3d 398, 407-08 (6th Cir. 2003) (upholding stop where police had reasonable suspicion of civil infraction) *with United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (invalidating stop where police did not have probable cause to believe a traffic infraction had occurred). Because we dispose of this case on other grounds, we assume without deciding that Officer Holmes had probable cause to stop Blair for a traffic violation.  Accordingly, we will not resolve the discrepancy between the probable cause and reasonable suspicion standards at this time.

*Gaddis*, 364 F.3d at 771 n.6).  Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion.  *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant.  *Whren v. United States*, 517 U.S. 806, 813 (1996).  As we previously have held, "police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop."  *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995); *see also Hill*, 195 F.3d at 265 (upholding stop supported by probable cause when officer initially followed vehicle because it was of a type used to transport narcotics).

The district court found that Officer Holmes had probable cause to stop Blair for a tag-light violation.  Blair contends that Officer Holmes lacked probable cause to stop him for two distinct reasons: Officer Holmes relied on the wrong law to justify the traffic stop, and Blair's tag-light was fully operational and therefore in accordance with the law.  We will consider each argument in turn.

First, Blair asserts that Officer Holmes stopped him based on an inapplicable traffic provision.  Officer Holmes cited Blair for "no tag-light" in violation of Knoxville City Code § 17-379(1)(b)(4), which provides:

> No person shall operate a motor vehicle on the public streets of the city or property owned by or leased to the city's community development corporation unless such vehicle is equipped with an operating lamp or lamps so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from fifty (50) feet to the rear.  Any such lamp or lamps shall be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted.  This subsection does not apply to any motor vehicle assembled or manufactured prior to January 1, 1968.

Blair asserts that he was not in violation of this provision because Officer Holmes never suggested that the car was not equipped with a tag-light, only that the light was not working properly.  As a result, Blair argues, Officer Holmes should have relied on § 17-379(c), which requires "lights to be in operating condition."

Blair's argument fails to appreciate that § 17-379(1)(b)(4) requires a car not only to be "equipped" with a tag-light, but to be equipped with "an operating lamp" that renders the license plate clearly legible from a distance of fifty feet.  Based on Officer Holmes's testimony that he could not make out Blair's license plate from a distance of ten feet, Officer Holmes cited the correct provision to justify the stop.

We now turn to Blair's second argument, that Officer Holmes lacked probable cause to stop Blair based on a faulty tag-light.  Blair points out that although Officer Holmes twice told Blair that the tag-light was burned out, the video of the stop shows that the tag-light was operational.  Furthermore, due to the distance and angle between Officer Holmes's and Blair's cars before the stop, Blair claims that Officer Holmes could not have developed probable cause that Blair's tag-light was not working.

The district court credited Officer Holmes's testimony that he could observe Blair's tag-light, initially believed it to be burned out, saw the light illuminate during the stop, and still believed the stop was justified because the license plate was not legible from a distance of ten feet.  This credibility determination was central to the district court's finding of probable cause, and "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985).

This Court, however, entertains serious doubt as to Officer Holmes's justification for the stop, primarily because the video evidence shows that the tag-light was fully operational. Nonetheless, we realize that the video evidence does not offer a complete picture of the stop and its attendant circumstances. Furthermore, even if Officer Holmes had probable cause to stop Blair, the evidence seized as a result of the stop must be suppressed for reasons discussed below. We therefore will assume without deciding that the stop was supported by probable cause.

### 2.        Reasonable Suspicion of Criminal Activity for *Terry* Stop

The district court found that the stop also was valid under *Terry v. Ohio*, 392 U.S. 1 (1968), which governs traffic stops made on the basis of suspected criminal activity. *See Sanford*, 476 F.3d at 394. Under *Terry*, police may stop a vehicle based on reasonable suspicion of an ongoing crime. *Id.*; *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A *Terry* stop must be supported by specific and articulable facts that would "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 21-22 (citations omitted). In other words, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *Terry*, 392 U.S. at 27). Additionally, the stop must be justified at its inception, and it must be reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, 392 U.S. at 19-20. We consider the totality of the circumstances to determine the validity of a *Terry stop*. *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002) (citing *United States v. Roberts*, 986 F.2d 1026, 1029 (6th Cir. 1993)).

At the outset, Blair argues that the government never asserted *Terry* as a justification for the stop until the suppression hearing and thus cannot rely on *Terry* as a basis for the stop. A quick review of the record disposes of this argument because the government raised the *Terry* theory in its response to Blair's motion to suppress.

Although we have assumed that the stop was supported by probable cause, we must address the *Terry* issue to determine the permissible scope of the stop. The district court found that Officer Holmes's stop of Blair was justified as a *Terry* stop based on a reasonable suspicion that Blair possessed narcotics. The district court upheld the *Terry* stop under two different scenarios. We will address each in turn.

### a.        *Terry* Stop Based on Time, Area, and Known Drug House

The district court first found that a *Terry* stop was justified based on Officer Holmes's knowledge that Blair's vehicle had just left a known drug house in a high-crime drug-trafficking area at night. Blair contends that this finding was erroneous and that, as a result, Officer Holmes did not possess the reasonable, articulable suspicion necessary for a *Terry* stop.

While we agree with the district court that Officer Holmes knew of the area's reputation for drug-trafficking and certainly knew of the hour, we find clear error in the district court's conclusion that Officer Holmes knew that Blair's car had just left a known drug house. Officer Holmes testified that Officer Munday telephoned when Blair's car was leaving the suspect house. From his vantage point, Officer Holmes could not see the house, and he did not see Blair's vehicle leave the house. When Officer Munday said a vehicle was leaving the suspect house, Officer Holmes was unsure to which vehicle he was referring. Six minutes into the stop, Officer Holmes asked Officer Munday to come to the scene to verify that Blair's car was the same one Officer Munday observed at the suspect house. Accordingly, we find clear error in the district court's conclusion that, prior to the stop, Officer Holmes knew that Blair's vehicle had just left a known drug house.

The question remains whether the late hour and high-crime area justify a *Terry* stop. We hold they do not. That a given locale is well known for criminal activity will not by itself justify a

*Terry* stop, although it may be taken into account with other factors. *Martin*, 289 F.3d at 397 (citing *Wardlow*, 528 U.S. at 123). The only other factor to consider here is that the stop occurred at night. A late hour can contribute to reasonable suspicion; however, our cases so holding typically involve a much later hour than that involved here. *See United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (discussing a stop that took place at 1:20 a.m.); *United States v. Bailey*, 302 F.3d 652, 659 (6th Cir. 2002) (addressing a stop that took place at 1:00 a.m.). Blair was stopped at approximately 10:30 p.m., an hour not late enough to arouse suspicion of criminal activity. Accordingly, Officer Holmes did not have reasonable suspicion to suspect Blair of criminal activity simply because he was driving in a bad neighborhood at 10:30 at night.

### b.       *Terry* **Stop Based on Hand-to-Hand Transaction**

The district court also found that Officer Holmes had reasonable suspicion that Blair was involved in drug activity based on "some evidence that Officer Holmes knew of the hand-to-hand transaction prior to the traffic stop." This Court finds the district court's conclusion of fact on this issue clearly erroneous.

Officers Munday and Holmes offered contradictory testimony regarding when Officer Holmes learned of the hand-to-hand transaction. Officer Munday testified that as soon as he saw the transaction, he informed Officer Holmes. Officer Holmes, on the other hand, testified that he did not hear of the hand-to-hand transaction until after the stop occurred. Although Officer Holmes suggested that he and Officer Munday were communicating before the stop, Officer Holmes was unequivocal regarding when he learned of the hand-to-hand transaction: after the stop. Therefore, even viewing the evidence in the light most favorable to the government, this Court finds that Officer Holmes did not know of the hand-to-hand transaction prior to the traffic stop. Consequently, the transaction could not provide reasonable suspicion for Officer Holmes to stop Blair.

We also note that Officer Holmes never has suggested that he stopped Blair based on a suspicion of narcotics. When Blair asked why he was pulled over, Officer Holmes repeatedly gave the tag-light violation as the reason. Officer Holmes also testified that he stopped Blair because of the tag-light violation. The only suggestion of a *Terry* stop appears in the government's briefs.

### c.       **Officers' Collective Knowledge**

The government contends that the hand-to-hand transaction could justify a *Terry* stop based on the collective knowledge of Officers Munday and Holmes. We reject this argument. The government cites *United States v. Barnes*, 910 F.2d 1342, 1344 (6th Cir. 1990), for the unremarkable proposition that one officer may conduct a *Terry* stop based on information obtained from another officer. According to Officer Holmes's own testimony, however, he did not obtain information regarding the hand-to-hand transaction until after the stop occurred. The government's reliance on *United States v. Hensley*, 469 U.S. 221, 235 (1985), is similarly misplaced, as the case is readily distinguishable. In *Hensley*, the Court upheld a *Terry* stop by one police department premised on a "wanted" flyer issued by another department. The flyer contained information that the defendant was wanted for investigation of an aggravated robbery. *Id.* at 223. The Court concluded that because the department that issued the flyer had reasonable, articulable facts that would justify a *Terry* stop, the other department could rely on the flyer. *Id.* at 235. In the case at hand, however, Officer Munday never communicated why Blair should be stopped, or even that he should be stopped at all. According to Officer Holmes, the only information he received prior to the stop was that a car was leaving the suspect house. As a result, *Hensley* does not apply.

The government also looks to *United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976), in which we held that "when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be

considered in determining probable cause, not just the knowledge of the individual who physically effected the arrest." Had Officers Munday and Holmes decided together to stop Blair, information known only to Officer Munday would be relevant. Here, though, the officers did not make a collective decision to stop Blair, and thus Officer Munday's knowledge of the hand-to-hand transaction cannot be imputed to Officer Holmes.

In light of the above, we hold that under either scenario considered by the district court, Officer Holmes did not possess the reasonable, articulable facts necessary to initiate a *Terry* stop.

### 3.    Scope and Duration of Stop

Because we assume Officer Holmes had probable cause to stop Blair for a tag-light violation, but hold that he did not have reasonable suspicion to stop Blair for possession of narcotics, we must determine the proper scope and duration of the stop. Once the purpose of a traffic stop is completed, a police officer "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006) (quoting *Mesa*, 62 F.3d at 162). Officer Holmes testified that he had all the information necessary to write a citation for the tag-light violation and for no proof of insurance shortly after 22:45:31 on the videotape. From that point forward, the purpose of the traffic stop would have been completed almost immediately, in the time necessary for Officer Holmes to issue the citation and send Blair on his way.

Approximately two minutes later, Officer Holmes asked for and was denied consent to search Blair's car. This alone did not extend the stop beyond its permissible scope. *See United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003) (holding that asking for consent to search a vehicle did not unreasonably extend the scope of an ordinary traffic stop). Officer Holmes then informed Blair that he believed drugs were in the car and that he would call a canine unit to the scene. This action extended the scope and duration of the stop beyond that necessary to issue a citation for a tag-light violation. Because Officer Holmes had not developed reasonable, articulable suspicion of criminal activity by that point, we hold that the remainder of the stop violated the Fourth Amendment.

The government contends that numerous occurrences during the stop justified Officer Holmes's prolonged detention of Blair. We disagree. Officer Holmes testified that he worried that Blair would try to flee because he attempted to exit his vehicle immediately upon being pulled over. Our review of the video evidence, however, convinces us that Blair simply wanted to check the condition of his tag-light, which, after all, was the reason given by Officer Holmes for the stop. When Officer Holmes told Blair to stay in the car, he complied immediately and without protest. We therefore conclude that Officer Holmes's purported fear of Blair's flight was not reasonable.

The government also argues that before he extended the stop, Officer Holmes had learned from Officer Munday that Blair was involved in a possible hand-to-hand drug transaction. But as we already have discussed, the district court clearly erred when it concluded that Officer Holmes knew that Blair had just left the suspect house. It was not until Officer Munday arrived on the scene that Blair was confirmed as the man Officer Munday saw at the suspect house. Accordingly, when Officer Holmes extended the stop, he could not have known that Blair was involved in a possible hand-to-hand drug transaction. It follows, then, that the drug transaction could not serve as a basis for the prolonged detention.

We are left with Officer Holmes's testimony that Blair was unusually nervous and was reaching under the seats. As we previously have noted, nervousness is "an unreliable indicator, especially in the context of a traffic stop. Many citizens become nervous during a traffic stop, even when they have nothing to hide or fear." *United States v. Richardson*, 385 F.3d 625, 630-31 (6th

Cir. 2004) (citing *United States v. Saperstein*, 723 F.2d 1221, 1228 (6th Cir. 1983)).  And while evasive behavior is a pertinent factor in determining reasonable suspicion, *Wardlow*, 528 U.S. at 124, Blair's act of reaching under the seats, without more, does not justify a *Terry* stop.

Based on the totality of the circumstances, therefore, we hold that Officer Holmes did not possess the reasonable, articulable suspicion of criminal activity necessary to extend the scope and duration of the stop.  As a result, Officer Holmes's prolonged detention of Blair was not justified at its inception and therefore was not a valid *Terry* stop.[3]  Accordingly, the stop violated the Fourth Amendment, and all evidence seized as a result of the stop must be suppressed as "fruits of the poisonous tree."  *Hill*, 195 F.3d at 264.

We therefore REVERSE the district court's denial of Blair's motion to suppress the evidence.

### B.    Plea Agreement

Blair has raised serious questions about the plea agreement that he entered into with the government, particularly regarding the agreement's ambiguity, whether the government's conduct breached the agreement, and the proper remedy in the event of a breach.  We do not reach these questions, however, as we have reversed the district court's denial of Blair's motion to suppress.

### C.    Sentencing

Blair was sentenced to concurrent sentences of 120 months for the firearm charge and 121 months for the drug charge.  Had Blair been sentenced for the firearm charge alone, his sentence would have been markedly lower.  The Presentence Investigation Report in the firearm case recommended an advisory sentencing range of 30 to 37 months.  Because Blair was sentenced for both offenses at the same time, however, the advisory sentencing range for the firearm charge was recalculated using the much higher base offense level for the drug charge, pursuant to the Multiple-Count Adjustment set forth in USSG § 3D1.4.  As a result, Blair's sentence for the firearm charge was approximately four times greater than it would have been had he been sentenced for the firearm charge alone.

Because we have reversed the district court's denial of Blair's motion to suppress, we VACATE Blair's sentence for the firearm charge and REMAND the firearm charge so that the district court can reevaluate Blair's sentence after recalculating the appropriate guideline range.

## IV.    Conclusion

For the foregoing reasons, we REVERSE the district court's denial of Blair's motion to suppress, VACATE Blair's sentence for the firearm charge, and REMAND the case for further proceedings consistent with this opinion.

---

[3]Although we need not reach the question of whether the prolonged detention was reasonable in its scope, we note our concern in the thirteen-minute delay between the stop's extension and the canine unit's arrival on the scene. This hardly suggests that "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).