**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0185n.06

**No. 08-5814**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Mar 24, 2010**

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JIMMY SPRAGUE,

     Defendant-Appellant.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

**OPINION**

BEFORE:    **CLAY and McKEAGUE, Circuit Judges; POLSTER, District Judge.**[*]

**CLAY, Circuit Judge.**  Defendant Jimmy Sprague pleaded guilty to receiving child pornography transported in interstate commerce in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) and was sentenced to 360 months in prison. Defendant appeals the denial of a motion to suppress evidence taken following a search of his apartment. In addition, he challenges his sentence as substantively unreasonable. For the following reasons, both the district court's denial of the motion to suppress and the sentence are **AFFIRMED**.

**BACKGROUND**

**A.    Procedural History**

_____

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation

Tennessee state police officers executed a search warrant at Defendant's home on August 19, 2005. In the course of that search, they seized Defendant's computer. A separate warrant was issued on December 15, 2005 to search the contents of the computer, and over 800 images of child pornography were saved on the computer. A grand jury indicted Defendant on May 9, 2006 for receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) and possessing a computer containing images of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).

Defendant filed a motion to suppress the evidence. A magistrate judge held an evidentiary hearing on October 4, 2006 and recommended denying the motion to suppress. The district court overruled Defendant's objections to the magistrate judge's Report and Recommendation and denied the motion to suppress.

On September 21, 2007, Defendant pleaded guilty to receiving child pornography, and the second charge of possessing a computer containing images of child pornography was dropped.[1] The sentencing guidelines calculation called for a sentence of 121 to 151 months, but the mandatory minimum based on Defendant's previous criminal history was 180 months. The maximum jail sentence he could receive was 480 months. Pursuant to the plea agreement, the government agreed that no images portrayed sadistic or masochistic conduct as defined by U.S.S.G. § 2G2.2(b)(4). Defendant's Presentence Report ("PSR") found that at least four images portrayed sadistic and masochistic conduct, and if the enhancement had been applied, Defendant's guidelines range would have been 188 to 235 months. On June 23, 2008, the district court sentenced Defendant to 360

---

[1]Defendant had previously challenged his competency to stand trial. Following a full evaluation, the district court found him competent, and Defendant does not challenge that ruling.

months' imprisonment. Defendant filed a timely appeal challenging the search of his apartment and the reasonableness of his sentence.

## B.     Search Warrant

A search warrant was obtained by the Kingsport, Tennessee police department on August 19, 2005 to search the premises of an apartment leased by Defendant in Kingston, Tennessee (the "Prospect Drive apartment"). The search warrant was issued following the submission of an affidavit by Detective Melanie Adkins. The search warrant asserted that Defendant was not in compliance with the requirements of the state sex offender registration statute and that he had perjured himself in his sworn declarations relating to those registration materials and various other court documents. Defendant was barred from associating with minors, but Adkins had learned that he was repeatedly having contact with children by playing the role of Santa Claus. Additionally, Defendant's registration materials and multiple sworn Affidavits of Indigency stated that he only owned one car, a 1979 Pontiac, while two pickup trucks were registered in his name. Defendant had been seen driving both trucks. Finally, Defendant had claimed financial responsibility for two minor daughters who allegedly lived with him, but Defendant had restrictions against living with minors and was required to notify authorities within 48 hours of a minor coming to live in his residence.

The search warrant was signed by the state court judge on August 19, 2005 and executed that same day. State police officers confiscated Defendant's computer and storage media, paper files, disposable cameras, videotapes, a Santa Claus costume, and $39,280 cash. Included were numerous discs and videos that were either children's videos or various pornographic movies, including discs labeled "teen porn." Upon driving away from the search, Adkins saw Defendant and stopped him based on an active warrant for failure to appear. Adkins informed him of the search of the Prospect Drive apartment, and Defendant consented to the search of his storage facility. Defendant also

informed Adkins that he was currently living with a Sandra Conley. Conley confirmed this, and a search warrant was subsequently obtained for her residence. As stated above, a search warrant was also later obtained to search Defendant's computer.

At the suppression hearing before the magistrate judge, Defendant called five witnesses. The first witness, Diane Burkhart, was the manager of the apartment complex where the search occurred. She testified that she had been in Defendant's apartment before the search because maintenance was forced to install new locks after Defendant had changed the locks without permission. Burkhart did not know whether Defendant had been given new keys to the apartment. She also testified confusingly about when she became aware of Defendant's status as a sex offender, suggesting that she first learned in talking with Detective Adkins in August but later clarified her testimony to state that another officer informed her in May, 2005.

Mary Jones, an employee with the agency that provided Section 8 housing vouchers to Defendant, testified that she had been contacted by Burkhart while the search of the apartment was ongoing. Jones further testified that Burkhart informed her that Defendant had not lived in the apartment in three years. Burkhart denied ever making this remark because she had not even been at the complex that long and therefore "wouldn't know that." (Suppression Hr. Tr. 21). Burkhart testified that the messy state of the apartment as viewed during the search led her to tell Jones that there was "no way that you could be living there." *Id*.

Adkins testified that she became aware of Defendant in June 2005 based on her involvement with allegations by a minor who had filed a harassment complaint against Defendant. Adkins learned that Defendant was a registered sex offender, and she started investigating his apparent violations of the sex offender registration requirements. Adkins subsequently charged Defendant in state court with violating the registration requirements. Before the search warrant was issued, but

after Adkins completed the affidavit, an indictment was returned by a grand jury on the charges that Defendant violated his registration requirements and committed perjury. Adkins also testified that Burkhart had informed her that the apartment was Defendant's residence The two did not discuss whether it was Defendant's primary or secondary residence.

The fourth witness was Detective Penny Makowski who, like Adkins, worked for the Kingsport Police Department. The final witness was Amy Ennis, a neighbor of Defendant's at the apartment complex. Ennis testified that she saw a blonde, heavyset woman going in and out of Defendant's apartment in the days preceding the search, and testified that it was Makowski. She testified that: "I can honestly say yes. I do believe I did see [Makowski] there." (Suppression Hr. Tr. 180). She also noted Burkhart entering Defendant's apartment with a man who she did not recognize and who was "too well dressed" to be a maintenance man. (Suppression Hr. Tr. 182).

## C.    Sentencing

The sentencing guidelines for Defendant called for a sentence of 180 months because it was the mandatory minimum sentence and higher than the guideline range. The probation officer noted that at the time of the PSR, Defendant had several state charges pending, including telephone harassment, stalking, failure to comply with the sex offender registry, aggravated perjury, sexual battery, and solicitation of a minor. (PSR 11-13).

Defendant objected to the PSR, alleging that allegations in paragraphs five through seven were false. Those paragraphs involved an alleged complaint by a fellow inmate that Defendant had tried to have sex with him, allegations of prescription medicine being discovered under Defendant's mat in jail, and finding a series of newspaper articles in his cell having to do with stories of a sexual nature. In his sentencing memorandum, Defendant also noted that he would be in his late seventies at the end of fifteen years, the minimum sentence he could receive.

At the sentencing hearing, Adkins testified that Defendant's apartment complex adjoined a daycare center and was one block from an elementary school. Adkins testified that she took a statement from a ten-year-old girl who had seen Defendant hanging around the playground at the school on weekends. Defendant asked the girl to come to his car, grabbed her to pull her into his car, and only released her when a police car passed. The girl also stated that one time Defendant asked her to look under the car to get a cat, and when she bent down, he began fondling her breasts. Adkins further testified that Defendant had played Santa Claus at various churches, schools, and community centers, and that he had, without authorization, entered one school dressed as Santa Claus. Defendant also frequented a skating rink where many children and teenagers were found. Following the execution of the search warrant, Defendant invited Adkins to go to the skating rink with him so that she "could see how well they liked him." (Sentencing Tr. 20). A girl filed a restraining order, and stalking charges were filed against Defendant in part based on activity arising at the skating rink. Adkins further testified that when Defendant's storage unit was searched, it contained "numerous children's toys, children's clothes, shoes, books." (Sentencing Tr. 24).

Shana Lynn testified that she met Defendant while visiting her mother, Sandra Conley. At the time, Lynn was 16 years old. Lynn indicated that Defendant repeatedly asked her to engage in oral sex with him. Eventually she allowed him to perform oral sex on her, even though she did not want him to do it. Following this event, Defendant asked Lynn's 14 year old sister if he could perform oral sex on her. Defendant subsequently tried to contact Lynn repeatedly, claiming to be her real father. Lynn testified that while she used to be afraid of Defendant, she no longer was.[2]

---

[2]The government also put on a witness from the Washington County Sheriff's Detention Center, Brenda Downes, to testify about the allegations against Defendant made by his former cell mate, Justin Keffer. Defendant called Keffer himself, and Keffer recanted the allegations he previously made to Downes. The district court explicitly did not rely on any of this testimony.

The district court engaged in a lengthy discussion of the § 3553(a) factors, noting some of the images Defendant possessed showed rapes of "very young children" by adults that the district court called "torture." In considering the "history and characteristics of the Defendant," the court found that Defendant "is a previously convicted sex offender . . . who has previously committed sexual crimes against children." (Sentencing Tr. 71). The district court recounted Defendant's prior convictions and noted that one did not count towards his criminal history points. The court noted that Defendant's continued illegal conduct "indicate quite clearly that Mr. Sprague's sexual deviance, if you will, was not cured by his former term of imprisonment." (Sentencing Tr. 72). The district court noted that Defendant lived near places frequented by children, that he possessed articles that could be used to entice children, that he dressed as Santa Claus to be near children, and that he frequently went to a skating rink.

After reciting these facts, the court held that: "The proof in this case establishes that Mr. Sprague is a child sexual predator who has been actively seeking additional victims." Furthermore, he "presents a continued risk of reoffending and . . . is a high risk for recidivism." (Sentencing Tr. 73). The district court found by a preponderance of the evidence that Defendant had committed numerous sexual offenses over the past two or three years. The court specifically credited the testimony of Lynn and believed those acts occurred.

In response to Defendant's arguments about his medical condition and his advanced age, the district court found that the acts that occurred between 2004 and 2006 happened while Defendant was suffering from his medical condition. The court concluded: "It appears to this court that neither age nor physical infirmity will in any way deter Mr. Sprague from committing further offenses, and the facts in this case establish that the only way to protect the public is in fact to imprison Mr. Sprague for the rest of his natural life." (Sentencing Tr. 76-77). Defendant was subject to a

maximum of 480 months' imprisonment. The district court sentenced him to 360 months, meaning Defendant would be incarcerated past his 90th birthday.

## DISCUSSION

### I. **Motion to Suppress**.

"This court reviews a district court's decision on a motion to suppress under two standards. 'Findings of fact are upheld unless clearly erroneous, while conclusions of law are reviewed *de novo*.'" *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005) (quoting *United States v. Leake*, 95 F.3d 409, 416 (6th Cir. 1996)). "This court views the evidence in the light most likely to support the district court's decision." *United States v. McPhearson*, 469 F.3d 518, 523 (6th Cir. 2006) (internal quotation omitted). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008) (internal quotation omitted).

Defendant premises his appeal of the denial of his motion to suppress on two theories. First, he argues that the affidavit for the first search warrant contained a material falsehood, that the apartment constituted Defendant's primary residence. Second, Defendant argues that the purpose of the search was to uncover child pornography, not to investigate the alleged violations of Defendant's obligations to register as a sex offender. "In *Franks v. Delaware*, [438 U.S. 154, 171 (1978),] the Supreme Court created procedural protections for a defendant who claimed that the affidavit supporting the probable cause of a search warrant contained intentional or reckless falsehoods. The Court stated that it presumed the validity of the affidavit in support of the search warrant." *United States v. Abboud*, 438 F.3d 554, 574 (6th Cir. 2006). The burden is on the defendant to show such falsehoods in the affidavit. If the defendant meets this burden, then the

question becomes whether the affidavit is sufficient to support probable cause without the falsehoods. *Id.* Defendant fails to provide sufficient evidence to overcome the presumption of the validity of the search warrant.

The question of whether the apartment was Defendant's primary address is easily resolved. As a preliminary matter, Detective Adkins never swore in the affidavit that it was his primary residence. The affidavit stated that the Prospect Drive apartment was "resided in or occupied and possessed by" Defendant, not that it was his primary residence. The apartment was undoubtedly still possessed by Defendant, and even if he were usually staying at Conley's place, he still had a large number of possessions at the Prospect Drive apartment, including an outdoor cat. Additionally, Defendant received a Section 8 voucher, which is only available for a primary residence, for the apartment. He stated that the apartment was his address on all of his registration forms to register as a sex offender as well as other sworn legal documents.

Defendant does not offer any conclusive evidence that Adkins did not believe that the Prospect Drive apartment was "resided in or occupied and possessed by" Defendant. Defendant acknowledges that Burkhart told Adkins that the apartment was his "residence," highlighting that she did not tell Adkins it was his "primary residence." Burkhart did testify that nobody could live in that apartment because it was so messy, but no evidence suggests that she told that information to Adkins. The fact that Burkhart told that information to Jones is certainly evidence that she might have told it to Adkins as well, but Adkins specifically testified that she was not told that Defendant did not live there. Reviewing the district court's factual determinations for clear error, we easily find that the sworn testimony of a witness can outweigh the speculation that Burkhart would have relayed the same information to two different people. This Court cannot overturn a district court's factual findings unless it is left with the "definite and firm conviction that a mistake has been committed."

*Blair*, 524 F.3d at 747 (internal quotation omitted). The district court assuredly did not err in declining to find that Adkins committed a *Franks* violation in her affidavit.[3]

Defendant next contends that while the affidavit for the search warrant stated that it was investigating violations of the sex offender registration requirements and perjury, it was really intended to find child pornography. Defendant's argument is based on the fact that the grand jury issued an indictment for Defendant on the registration violations and perjury charges before the search warrant was executed.

The argument that the evidence should be suppressed based on the alleged true motives of Adkins must fail for a number of reasons. First, while the registration violations had been brought before the grand jury, Adkins testified that she did not know the indictment was issued when she presented her warrant affidavit. (Suppression Hr. Tr. 87-89). Second, the fact that an indictment was issued does not automatically mean that all investigation should stop. For instance, one of the allegations that Defendant was in violation of the sex offender registration requirements was that he had contact with children by playing Santa Claus. It certainly bolsters the government's case to procure the Santa Claus suit and numerous pictures with Defendant dressed as Santa Claus found at the Prospect Drive apartment.

It is possible that the officers were hoping to find child pornography on the computers, but we are unaware of any principle of law that a search warrant issued based on credible allegations of

_____

[3]Defendant also cites an affidavit for a warrant on Conley's apartment that Adkins submitted on August 23, 2005 stating that Defendant did not stay in the Prospect Drive apartment. This language is not a sign that Adkins would use "whatever language in the affidavit that she needed in order to leap frog from the search of one set of premises to another." (Def. Br. 33). That affidavit was submitted after Adkins entered the Prospect Drive apartment pursuant to the search warrant on August 19, 2005. Adkins assuredly could assume that the address that Defendant listed on all legal documents was his residence but subsequently realize, after seeing the place was uninhabitable during the execution of a search warrant, that Defendant may not have been generally staying at that address.

illegal activity is invalid where the officers hope to find information of additional criminal activity. Supreme Court jurisprudence would suggest the opposite. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). The fruits of this search furthered the goals of an on-going criminal investigation, and we are not concerned with aspersions cast on the motives of the officers in such a situation.[4]

Defendant finally argues that the search was precipitated by previous illegal entries into Defendant's apartment that tipped the authorities off to the fact that child pornography was in the residence. If true, the subsequent warrant could be problematic.[5] Defendant relies on the testimony of his neighbor, Ennis, that someone matching Detective Makowski's appearance had previously entered the apartment. Defendant argues that this testimony, together with the fact that Adkins and Burkhart were in contact before the search, indicates that the officers knew about the child pornography through prior warrantless entries. The problem for Defendant is that the magistrate judge considered Ennis' testimony "less than unequivocal" and considered a contest between

---

[4]Obviously, the police can only conduct a search consistent with the search warrant, but Defendant does argue that the search exceeded the scope of the warrant and does not argue that any of the material seized from his apartment was unlawful. *See United States v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007) (noting that a search "pursuant to a valid warrant may devolve into an invalid general search if the officers flagrantly disregard the limitations of the search warrant") (internal quotations omitted). Furthermore, officers were legally entitled to be in Defendant's apartment to investigate the registration and perjury allegations, so the fact that they came across evidence of child pornography is simply not problematic. *See, e.g., United States v. Reed*, 141 F.3d 644, 649 (6th Cir. 1998) (holding that as long as person is "legally present at their vantage when their respective senses are aroused by obviously incriminating evidence, a search within the meaning of the Fourth Amendment has not occurred").

[5]If the government could demonstrate that it would have searched the apartment anyway pursuant to Adkins' investigation, then any prior illegal searches would not lead to the suppression of evidence. *See United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (acknowledging that "the inevitable discovery exception to the exclusionary rule applies when . . . evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first").

Adkins' credibility and Ennis' credibility "not even close." The magistrate judge's factual finding that no illegal entry had previously occurred was not clearly erroneous.

## II.     Reasonableness of Sentence

### A.     Standard of Review

We "review a district court's sentencing determination, 'under a deferential abuse-of-discretion standard,' for reasonableness[.]" *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)); *see also Rita v. United States*, 551 U.S. 338, 347-51(2007). This standard applies "'[r]egardless of whether the sentence imposed is inside or outside the Guidelines range . . . .'" *United States v. Higgins*, 557 F.3d 381, 397 (6th Cir. 2009) (quoting *Gall*, 552 U.S. at 51). *United States v. Booker* determined that sentencing judges are permitted "to tailor the sentence in light of other statutory concerns as well." 543 U.S. 220, 245 (2005) (citing 18 U.S.C. § 3553(a)). "Thus, a district court's decision to exercise its discretion to depart from the advisory Guidelines, either upward or downward, is reviewed for reasonableness." *United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009). *See United States v. Smith*, 474 F.3d 888, 894 (6th Cir. 2007) ("Therefore, it is here that we will incorporate our post-*Booker* jurisprudence to our review of upward departures under § 4A1.3.").

### B.     Analysis

Defendant challenges only the substantive reasonableness of his 360 month sentence. "[T]he district court's task is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of the statutory sentencing scheme." *United States v. Presley*, 547 F.3d 625, 630-31 (6th Cir. 2008) (internal quotation omitted). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on

impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008).

The guidelines calculations for Defendant's sentence in the presentence report called for a guidelines range of 121 to 151 months. Defendant, however, was subject to a mandatory minimum sentence of 180 months pursuant to 18 U.S.C. § 2252A(b)(1). The guidelines are explicit that where a mandatory minimum sentence is greater than the maximum of the guidelines range, "the statutorily required minimum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1(b). A guideline sentence for Defendant, therefore, would have been 180 months. The government initially requested a 180 month sentence in its sentencing memorandum. At the actual sentencing, the government revised its position and stated that "the factual basis is in the record for the court to upwardly vary, and to do so to protect the children in any community where Mr. Sprague may be released upon his term of imprisonment." (Sentencing Tr. at 65).

The district court imposed a sentence of 360 months, a sentence twice as long as the guideline sentence. Defendant challenges the substantive reasonableness of this sentence on several grounds. First, Defendant argues that all of the relevant factors listed by the district court "are reflected in the sentencing guidelines and the statutory mandatory minimum." (Appellant's Br. at 27). Defendant also notes his declining medical condition, compares his sentence to that of a Jim Irwin who received 210 months for a child pornography conviction, and questions whether the conduct relied on by the district court was ever proven in a court of law.[6]

---

[6]Defendant also highlights inconsistencies in testimony regarding an alleged sexual assault while in prison of Keffer. Keffer was called at the sentencing hearing and recanted his previous statements to the jail supervisor who testified on behalf of the government. This issue is irrelevant. The district court specifically stated that the allegations regarding Defendant's conduct towards Keffer "will play no part in the court's decision in this case." (Sentencing Tr. at 68).

Defendant's argument that all the relevant conduct noted by the district court is included in the sentencing guidelines is simply not correct. The district court decided to give an above-guidelines sentence based primarily on the specific likelihood of Defendant re-offending.[7] The district court noted that even after Defendant was imprisoned on his previous convictions, he chose to live near a day care center and an elementary school with a playground. His residence and the storage unit were both filled with children's items, such as clothes, toys, and candy. He played Santa Claus at schools, churches, and community centers. The district court stated: "The proof in this case establishes that Mr. Sprague is a child sexual predator who has been actively seeking additional victims. The proof in this case also establishes that Mr. Sprague presents a continued risk of reoffending and that he is a high risk of recidivism." (Sentencing Tr. at 73). To bolster that conclusion, the district court found by a preponderance of the evidence that "Mr. Sprague has committed numerous sexual offenses over the last two or three years prior to him finding himself here today." *Id*. The district court specifically credited the testimony of Lynn, who testified about Defendant's sexual assault on her, and noted that the Bureau of Prisons classified Defendant as a pedophile and a malingerer. These facts are not accounted for in the guidelines for a typical child pornography conviction.

Defendant's argument about his medical condition must also fail. The district court specifically considered it, and while the district court believed that Defendant was exaggerating, and

---

[7]The district court did refer to a number of factors that are contemplated in the sentencing guidelines, including concern with the powerless victims that are the children and the heinousness of the abuse the children go through in the production of these images that Defendant obtained. The district court emphasized that some of these images were particularly appalling – including multiple images of adults engaging in sexual acts with the children – indicating that within the realm of child pornography offenders, the quantity and type of images possessed by Defendant were particularly appalling.

the Bureau of Prisons accused Defendant of malingering, the district court acknowledged that Defendant's medical condition was serious. The court, however, noted that Defendant would receive good medical treatment while in prison, and more importantly, noted that Defendant committed his offense and targeted children "when he was already suffering from those disabilities." (Sentencing Tr. at 75). The fact that Defendant submitted a life expectancy table indicating that his life expectancy was 14.8 years at the time of sentencing does not make the sentence substantively unreasonable. The district court is allowed to sentence someone to spend the rest of his life in jail.[8] This Court has previously affirmed a 360-month sentence for a seventy year old man for possession of child pornography. *United States v. Quinn*, 257 F. App'x 864 (6th Cir. 2007). In this case, where the court found that Defendant posed a major threat of reoffending and was committing offenses even in poor medical condition, the district court's decision to sentence Defendant to a term in prison longer than his life expectancy was not substantively unreasonable.

Defendant also submitted evidence of the sentencing of Jim Irwin, who received 210 months for a crime that included child pornography of his 8-year-old granddaughter. Defendant argues this is an unwarranted disparity under 18 U.S.C. § 3553(a)(6). This one other case is not helpful to Defendant. Irwin had no previous criminal history and had a statutory maximum sentence of 240 months. The district court in this case thought it highly relevant that not only did Defendant have

---

[8]In fact, the district court's specific intention was to give an effective life sentence. The district court said: "Mr. Sprague, so that the record will be clear, my purpose here today is to impose a sentence in this case that amounts to a life term of imprisonment. You should never be released from federal prison; and it gives me absolutely no pleasure to say that, but the record in this case clearly establishes the risk of reoffending." (Sentencing Tr. 77-78). Defendant does not specifically challenge this statement as an inappropriate consideration. We note that a sentencing judge is supposed to give a sentence "not greater than necessary" to comply with the statutory considerations. 18 U.S.C. § 3553(a). To give an effective life sentence, a judge needs to do a thorough review of all of the § 3553(a) factors to determine that a defendant should never have an opportunity to rejoin society. We feel comfortable that such an inquiry was undertaken in this case.

a repeated history of sexual abuse of minors, he did not change his ways after being convicted and imprisoned on those charges. Section 3553(a)(6) specifically provides the need to avoid unwarranted disparities between defendants "with similar records." This crucial difference between Defendant and Irwin means the disparity between the two sentences is not "unwarranted." *United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) (holding that "*unwarranted* disparities in sentencing is what should be avoided, *not* those that are warranted).[9]

We acknowledge that Defendant's sentence is twice his guideline sentence and emphasize that such a sentence requires a strong justification from a district court. In this case, however, the district court considered the appropriate factors and thoroughly justified the sentence. Therefore, the sentence is substantively reasonable.

## CONCLUSION

For the foregoing reasons, this judgment of the district court is **AFFIRMED**.

---

[9]Defendant also argues that the conduct relied on by the district court was never determined in a court of law. This argument appears to relate primarily to the testimony regarding Keffer, on which the district court explicitly did not rely. To the extent Defendant is concerned about the other facts found by the district court, circuit precedent is clear that "district judges in determining defendants' sentences may consider facts that they find under a preponderance-of-the-evidence standard." *United States v. Klups*, 514 F.3d 532, 537 (6th Cir. 2008). In this case, the district court thoroughly presented the facts that it found and the basis for finding those facts.