*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0229p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

           *Plaintiff-Appellant,*

    *v.*

No. 10-2402

KATRINA LYONS,

           *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-20224-011—Victoria A. Roberts, District Judge.

Argued: January 19, 2012

Decided and Filed:  July 25, 2012

Before:  CLAY, ROGERS, and DONALD, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Margaret Marie Smith, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant.  Harold Gurewitz, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellee.  **ON BRIEF:** Margaret Marie Smith, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant.  Harold Gurewitz, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge.  Defendant Katrina Lyons was charged with one count of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1); one count of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); and criminal forfeiture allegations, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853, after two Michigan state police troopers discovered narcotics in her

1

vehicle during a traffic stop requested by federal Drug Enforcement Administration (DEA) agents. The government now appeals an order by the district court that granted Defendant's motion to suppress the evidence seized during the stop. For the reasons that follow, we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

### I.　　The Initial Investigation

This case stems from a DEA investigation into a large-scale prescription drug ring and Medicare fraud scheme based out of Detroit, Michigan. The investigation's prime target, George Williams, was the owner and operator of a healthcare practice called Quick Response Medical Professionals, P.C. (QRMP). QRMP recruited Medicare-eligible patients who submitted to allegedly sham physical examinations with the practice's affiliated doctor, Milagros Ebreo, M.D. Dr. Ebreo allegedly prescribed QRMP's patients a variety of controlled substances, including oxycodone, vicodin, xanax, and prescription cough syrup. QRMP then retained possession of the prescriptions, filled them at cooperating pharmacies, and distributed the drugs through various intermediaries for street sale. In exchange, QRMP paid its patients small amounts of cash (usually between $150–$250) and billed Medicare for the fraudulent medical charges.

In pursuit of its scheme, QRMP employed several individuals who recruited and transported patients, scheduled doctor's visits, filed the fraudulent Medicare billings, and provided security and accounting services. The DEA's investigation, which began in June 2007, eventually expanded to include wiretaps of Williams' and several employees' phones as well as surveillance of suspected sites of QRMP operations.

George Williams managed QRMP out of several locations, including a business office, an office in his personal residence, and a hotel room in Southfield, Michigan. One location of particular significance to the scheme was a residence located at 20226 Stratford Road, in the Green Acres neighborhood of Detroit. The DEA learned

that QRMP had converted the Stratford Road house into Dr. Ebreo's medical office, where she saw patients for physical examinations and wrote out patient prescriptions. A QRMP employee, Yolando Young, acted as the site's "office manager," scheduling appointments and managing paperwork. DEA agents also witnessed various other QRMP employees transporting patients to and from the Stratford Road house for their appointments with Dr. Ebreo and her assistant. Williams, however, had not been seen at the Stratford Road house. Additionally, the agents neither observed nor received word of any packages traveling into or out of the residence. Based on these observations, the DEA theorized that the Stratford Road house was used primarily for QRMP's medical and financial operations, but not as a storage site for the controlled substances.

By the date of Defendant's arrest in this case, the DEA's investigation was well underway. In the fifteen months since the DEA began investigating QRMP, the agency successfully linked the medical practice to at least three multi-state traffic stops that yielded narcotics. Although the traffic stops were made in different states (Michigan, Ohio, and Kentucky), all the cars were plated to Kentucky. Based on the traffic stops, in addition to other evidence gathered in its investigation, the DEA concluded that QRMP was trafficking large amounts of controlled substances to the southern region of the United States, where the market for such drugs was especially lucrative.

**II.     DEA Surveillance of the Stratford Road House on September 25, 2008**

On September 25, 2008, DEA Special Agent Kevin Graber led a team assigned to surveil the Stratford Road house. Around 2:50 p.m., the agents took up a position just south of the residence where they observed Williams' Mercedes in the driveway. Shortly after the agents arrived, the Mercedes left the house. Several minutes later, Young, the office manager, also left. Several agents tailed Young to where she stopped at a local bank branch.

Around 3:07 p.m., the DEA agents monitoring the wiretaps intercepted a telephone call in which Young asked Williams if he was waiting for someone to arrive at the Stratford Road house. The agents listening to the wiretap relayed to the surveillance team that they could expect a female driving a gray vehicle with out-of-state

plates to arrive at the house. Several minutes thereafter, a gray minivan with Alabama plates pulled into the driveway.

A woman, later identified as Defendant, exited the minivan and approached the front porch of the house. A few minutes later, Williams pulled up to the Stratford Road house in the Mercedes. Defendant returned to her vehicle, and the two cars advanced up the driveway where they no longer could be viewed from the road. While the cars were parked behind the house, Agent Graber decided to have the minivan stopped after it left the residence.

Agent Graber contacted the Michigan State Police Department to organize a traffic stop by a marked cruiser. After speaking with a lieutenant through the general office line, Agent Graber was connected to on-duty Michigan State Police Troopers Marcus Wise and James Grubbs.[1] Agent Graber provided the troopers with a description of the minivan, its plate number, and its driver. According to Agent Graber's suppression hearing testimony, he also gave the troopers "limited, but substantial" details regarding the DEA's investigation into QRMP and the basic facts leading the DEA to believe narcotics would be found in the minivan. However, Agent Graber asked the troopers to develop independent probable cause for the stop, because the DEA did not want its lead targets tipped off that QRMP was under federal investigation.

## III.    The Traffic Stop

About an hour later, both cars departed the Stratford Road house. Using Agent Graber's description, the troopers quickly spotted the minivan. The troopers observed an air freshener and some bead necklaces hanging from the minivan's rearview mirror. Believing these objects to constitute a vision obstruction, a civil infraction under Michigan law, the troopers initiated a traffic stop. The troopers asked the driver, Defendant Katrina Lyons, for her identification, registration, and insurance information. Defendant produced an Alabama identification card and an unsigned car rental

---

[1]The record conflicts as to whether Agent Graber spoke with the troopers directly or whether his directions were communicated to the troopers via dispatch.

agreement, but she was unable to provide proof of insurance or a valid drivers license. The car rental agreement indicated that the minivan was rented the day before, for travel planned between Alabama and North Carolina. Trooper Wise noticed that Defendant's hands were shaking and that her breathing was deep and labored. He also smelled a distinctive odor of mothballs emanating from the vehicle, which he knew to be a method frequently used to mask the smell of narcotics.

Trooper Wise asked Defendant if she would exit the vehicle and give her consent to a search. At the suppression hearing, Trooper Wise testified that Defendant freely consented to both. Defendant, however, contested Trooper Wise's account. According to Defendant, she was first ordered to exit her vehicle and placed in handcuffs before Trooper Wise asked for her consent.

In either event, as Defendant exited her vehicle she reached for her purse. Trooper Wise testified that, out of a concern for his and his partner's safety, he also asked to look in the purse, and Defendant agreed. Trooper Wise discovered several large bundles of currency and a suspended Michigan drivers license. When asked about the source of the funds, Defendant stated that she did not know the amount of cash she was carrying, and she provided differing explanations as to how she obtained the money. When Trooper Wise advised Defendant that her stories were inconsistent, she became teary-eyed.

Meanwhile, Trooper Grubbs searched the minivan. Between the car and the purse, the troopers discovered over $11,000 in cash, 39 bottles of codeine cough syrup, and a box of mothballs. Defendant was formally arrested and transported to a Michigan state police station for processing. The troopers prepared an incident report that indicated Defendant was pulled over for a vision obstruction and that she was arrested based on the questionable status of her drivers license and the illegal narcotics recovered from her vehicle. The incident report did not mention the DEA's investigation or Agent Graber's instructions.

## IV.     The Motion to Suppress

On May 20, 2009, a federal grand jury returned an eighteen-count indictment against Defendant and ten other individuals involved in QRMP's operations. The indictment accused the defendants of conspiring to operate a fraudulent healthcare practice and with the illegal possession and distribution of controlled prescription drugs.[2] Defendant was individually charged with one count of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1); one count of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1); and criminal forfeiture allegations, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853.

Defendant filed a motion to suppress, arguing that the evidence seized from her vehicle was obtained in contravention of the Fourth Amendment. Defendant contended that the initial stop was invalid because the troopers' justification was pretextual and not supported by probable cause. The government responded that Defendant was validly stopped for a vision obstruction and that, in any event, the DEA had sufficient cause to believe that Defendant was engaged in illegal drug activity. The government also defended the search as permissible under the automobile exception to the warrant requirement and because of Defendant's consent. Defendant contended that her consent was obtained involuntarily.

The motion was referred to a magistrate judge, who conducted a two-day suppression hearing at which Agent Graber, Trooper Wise, and Trooper Grubbs testified. On February 22, 2010, the magistrate judge recommended denying Defendant's motion to suppress. The magistrate judge found that although the troopers lacked probable cause to believe there was a vision obstruction, the stop was nevertheless supported by the DEA's reasonable suspicion of drug trafficking activity. The magistrate judge also

---

[2]Apart from Defendant, Dr. Ebreo, and the pharmacist accused of filling the prescriptions, all the other co-defendants in this case have pleaded guilty to various counts of the indictment pursuant to plea agreements.

recommended that the search be found valid under the automobile exception and because Defendant gave consent.

Defendant filed objections to the magistrate judge's report and recommendation on March 4 and July 23, 2010, to which the government did not respond.   On August 31, 2010, the district court issued an order rejecting the magistrate judge's recommendations, granting Defendant's motion, and suppressing the evidence.   The district court concluded that the traffic stop was premised solely on the unfounded civil infraction and that the troopers did not act on the collective knowledge of the DEA's investigation.  Because the district court suppressed the evidence as the fruit of an illegal traffic stop, the court did not address whether the DEA had reasonable suspicion to order the stop, nor did it reach the propriety of the search performed by the troopers.

The government moved for reconsideration, but was denied.  It now brings this timely interim appeal.  Original jurisdiction exists pursuant to 18 U.S.C. § 3231, and this Court's appellate jurisdiction from a district court's suppression of evidence in a criminal case lies under 18 U.S.C. § 3731.

**ANALYSIS**

### I.       The Fourth Amendment Framework for Traffic Stops

Because Michigan's statute governing vision obstructions does not apply to vehicles registered in other states, the government abandons its position that the stop was permissible on the basis of a civil infraction.  *See* Mich. Comp. Laws § 257.709.  As a result, the government's position on appeal turns upon whether the DEA possessed reasonable suspicion to request the stop and whether the troopers were permitted to act upon the DEA's request.  The district court addressed only the second aspect of this argument, concluding that because there was "no evidence in the record that the minivan was stopped based on the DEA's investigation and collective knowledge," the troopers had no basis to execute the stop.

When reviewing a district court's decision on a motion to suppress, we review its findings of fact for clear error and its legal conclusions *de novo*.  *United States v.*

*Howard*, 621 F.3d 433, 450 (6th Cir. 2010).  Whether reasonable suspicion of criminal activity has been adequately established to justify a traffic stop is a mixed question of law and fact that we review *de novo*, *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008), although we consider the district court's decision in the light most favorable to the party that prevailed in the court below.  *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010).

"The Fourth Amendment forbids law enforcement officers from making unreasonable searches and seizures, 'and its protections extend to brief investigatory stops of . . . vehicles that fall short of traditional arrest.'"  *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  In order to effect a traffic stop, an officer must  possess either probable cause of a civil infraction or reasonable suspicion of criminal activity.  *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004).  We primarily enforce these standards through the exclusionary rule, which requires the suppression of any evidence seized during a vehicle search premised on an illegal traffic stop.  *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

Having disposed of the alleged civil infraction, the pertinent Fourth Amendment framework for the initial stop is therefore the reasonable suspicion standard.[3]  The reasonableness of a traffic stop is measured by the same standards set forth for investigatory stops in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny.  *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010).  Reasonable suspicion requires

> more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.  If an officer possesses a particularized and objective basis for suspecting the

---

[3]The parties, the district court, and the magistrate judge inconsistently and erroneously refer to the standard for traffic stops as a pure probable cause standard.  As noted above, this Circuit applies the higher probable cause standard to traffic stops based on civil infractions, and the lower reasonable suspicion standard to traffic stops based on ongoing criminal activity.  *Gaddis*, 364 F.3d at 771 n.6. The question of whether there is probable cause to search a detained vehicle is a separate inquiry. *See United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012).

particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop.

*Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008 ) (quoting *Smoak v. Hall*, 460 F.3d 768, 778–79 (6th Cir. 2006)).

Reasonable suspicion must be considered "under the totality of the circumstances, considering 'all of the information available to law enforcement officials at the time.'" *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (quoting *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003)).  Officers are entitled "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotation omitted).  "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 370–71 (6th Cir. 2008) (internal citations omitted); *United States v. Craig*, 306 F. App'x 256, 260 (6th Cir. 2009). "In considering the totality of the circumstances, 'we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (additional citation omitted)).

Provided that reasonable suspicion exists to support the initial stop, the principles that define the scope of reasonable police conduct under *Terry* also circumscribe any subsequent detention or search resulting therefrom.  *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).  The degree of a traffic stop's intrusion must be reasonably related in scope to the situation at hand, as judged by examining the reasonableness of the officer's conduct given his suspicions and the surrounding circumstances. *United States v. Davis*, 430 F.3d 345, 353–54 (6th Cir. 2005).  Accordingly, an officer may make inquiries unrelated to the traffic stop so long as those questions do not measurably

extend the detention and the individual's responses are voluntary. *Everett*, 601 F.3d at 496.

Reasonable suspicion supporting a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the car's occupants. *See United States v. Craig*, 198 F. App'x 459, 463 (6th Cir. 2006). Probable cause to search a vehicle is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998). Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

With this framework in mind, we examine the events leading up to Defendant's arrest.

## II.      The Traffic Stop

### A.      The DEA Possessed Reasonable Suspicion of Criminal Activity

"The relevance of any individual piece of information gathered by law enforcement, cannot be measured in a vacuum, but rather must be viewed together and in totality" with any background investigation. *See United States v. Redmond*, Nos. 10-5636, 10-5644, 2012 WL 1237787, at *7 (6th Cir. Apr. 13, 2012). On the date of Defendant's arrest, QRMP had been under federal investigation for fifteen months, and the Stratford Road house had been surveilled multiple times within the previous month. Accordingly, a significant and specific investigatory context informed the DEA's surveillance. Agent Graber testified that it was not only the series of events witnessed by the surveillance team, but also how those events fit within the DEA's broader knowledge of QRMP's criminal activities, that caused him to suspect Defendant of drug trafficking.

At the suppression hearing, Agent Graber articulated clear and specific facts to support his suspicion. Agent Graber explained that, immediately upon arriving at the house that day, the surveillance team was on alert because Williams, QRMP's ringleader, was not typically present at the Stratford Road house. Williams' presence

indicated to the agents that something atypical and important was occurring at the house that day. Agent Graber also noted the unusual set of circumstances preceding the minivan's arrival. Specifically, he pointed to the intercepted call between Williams and Young, in which Young made statements indicating that the visitor needed directions or was unfamiliar with the house. Furthermore, when the minivan arrived, the agents noted how the occupant of the Mercedes motioned to the minivan to proceed up the driveway where the vehicles could not be observed from the road. Agent Graber surmised that the cars were moved in effort to conceal criminal activity.

Moreover, the minivan had out-of-state plates, which was consistent with the three prior traffic stops linked to QRMP that involved cars plated to southern states. Additionally, the minivan's license plate indicated to the agents that its driver was unlikely to be a QRMP patient, because QRMP's patients were typically local Michigan residents escorted to their appointments by a QRMP employee. Agent Graber also noted that neither Dr. Ebreo nor her assistant were present that day.

Defendant counters that the DEA's observations could not have provided reasonable suspicion of criminal activity, because the events observed were all completely consistent with innocent behavior. Defendant also contends that much of the facts went against an inference of criminal activity, inasmuch as the evidence conflicted with the DEA's prior knowledge about QRMP's operations. Defendant points out that the DEA had no prior information about the minivan or its driver, nor had the DEA ever before suspected the Stratford Road house as being a site of QRMP's drug trafficking activities. She also contests the significance of her out-of-state license plate, pointing out that the prior traffic stops all involved Kentucky plates, whereas hers was from Alabama. Finally, Defendant claims that Agent Graber's suspicion amounted to nothing more than a "hunch" of criminal activity, based solely upon her presence at a location of interest to the DEA's investigation.

Considering the events of the day within the context of the DEA's lengthy investigation, Agent Graber possessed a reasonable and particularized suspicion to believe that Defendant visited the Stratford Road house for drug trafficking purposes.

The circumstances were suspicious when considered through the prism of the DEA's prior knowledge.

In reaching this conclusion, we note the similarities between this case and our decision in *United States v. Smith*, 510 F.3d 641 (6th Cir. 2007). *Smith* also involved a search of a vehicle related to a lengthy DEA drug trafficking investigation. Despite the fact that the officers had "no [prior] information or evidence regarding the *specific* car," this Court found probable cause for a search based on the DEA's broader investigation, which included knowledge that the car was one of many owned by a suspected drug trafficker, that the defendant frequently sold drugs from his vehicles, and that an informant had observed drugs stored in the defendant's vehicles. *Id.* at 649 (emphasis in original). This case parallels *Smith*, in that the DEA possessed specific objective information regarding QRMP's activities, the roles of QRMP's various players, and the typical use of the Stratford Road house in furthering QRMP's criminal schemes. Although the DEA had no specific information relating to Defendant or to her minivan, the agents were not required to set aside their prior knowledge when drawing inferences as to whether the circumstances suggested innocent or criminal activity. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[W]hile an individual's presence in an area of expected criminal activity, standing alone, is not enough to support [reasonable suspicion] . . . . officers are not required to ignore relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.") Moreover, the agents monitoring the wiretaps obtained specific information about a female driving a gray vehicle with out-of-state plates who would be unfamiliar with the area. The wiretap information was confirmed by Defendant's arrival to the house, her suspicious behavior thereafter, and the prior unusual circumstances of the day. All these observations, taken together, contributed to transforming otherwise innocuous circumstances into a suspicious series of events. Accordingly, the DEA possessed reasonable suspicion to order the traffic stop.

## B.     The Troopers Acted on the DEA's Collective Knowledge

It is well-established that an officer may conduct a stop based on information obtained by fellow officers. *United States v. Barnes*, 910 F.2d 1342, 1344 (6th Cir. 1990) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)). Variously called the "collective knowledge" or "fellow officer" rule, this doctrine recognizes the practical reality that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *Hensley*, 469 U.S. at 231 (quotation omitted). Because officers "must often act swiftly [and] cannot be expected to cross-examine their fellow officers about the foundation of transmitted information," we impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop. *Id.* at 230–3; *see also Whitely v. Warden*, 401 U.S. 560, 568 (1971). Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion.[4] *Dorsey*, 517 F.3d at 396; *Smoak*, 460 F.3d at 779. By imputing the investigating officer's suspicions onto the responding officer, without requiring the responding officer to independently weigh the reasonable suspicion analysis, the collective knowledge doctrine "preserves the propriety of the stop" and avoids crippling restrictions on our law enforcement. *United States v. Ibarra-Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999).

Despite its flexibility, the collective knowledge doctrine is not without its restrictions. The doctrine's primary boundary is, of course, the Fourth Amendment itself. As with any traditional investigative stop, a traffic stop based on collective knowledge must be supported by a proper basis and must remain reasonably related in its scope to the situation at hand. *See Davis*, 430 F.3d at 354. Accordingly, if an

---

[4]The collective knowledge doctrine applies equally to traffic stops and to vehicle searches. *See, e.g.*, *United States v. Williams*, No. 11-1476, 2012 WL 1700454, at *6 (6th Cir. May 15, 2012); *United States v. Perkins*, 994 F.2d 1184, 1189 (6th Cir. 1993)).

investigating officer "lacked sufficient information to satisfy the reasonable suspicion requirement, and the [responding officer's] subsequent observations did not produce reasonable suspicion," then the stop violates the Fourth Amendment. *Feathers* 319 F.3d at 849. Likewise, if a responding officer exceeds the stop's scope because he was not provided with the facts necessary to stay within its proper bounds, then any evidence improperly obtained therefrom remains subject to the exclusionary rule, just as if the investigating officer committed the error. *See, e.g.*, *United States v. Pineda-Buenaventura*, 622 F.3d 761, 776 n.5 (7th Cir. 2010) (finding that the exclusionary rule "remain[ed] in play" when supervisors failed to communicate the proper bounds of a search warrant to executing officers). The taint of a stop effected without reasonable suspicion similarly cannot be cured by an after-the-fact relay of information. *See Blair*, 524 F.3d at 751–52. Applying traditional Fourth Amendment restrictions equally to the collective knowledge doctrine ensures that communications among law enforcement remain an efficient conduit of permissible police activity, rather than a prophylactic against behavior that violates constitutional rights.

The Seventh Circuit has helpfully clarified the application of the collective knowledge doctrine by identifying three separate inquiries: (1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it. *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010) (citing *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)). We are persuaded by the simplicity of this approach.

Moreover, and from a purely functional standpoint, practical considerations naturally restrict the collective knowledge doctrine, because a responding officer is invariably in a better position when provided with the details helpful and necessary to perform his duties. The relay of sufficient information is critical to a responding officer who needs to, for example, report to the correct location, identify the correct suspect,

respond appropriately to exigent circumstances, and protect his safety and the safety of others.

Defendant maintains, however, that additional restrictions also limit the collective knowledge doctrine. First, she contends that the collective knowledge doctrine only applies where there is a "direct investigative relationship between the various law enforcement agencies" or where the law enforcement agents were in "close communication." *United States v. Pasquarille*, 20 F.3d 682, 689 (6th Cir. 1994); *Perkins*, 994 F.2d at 1189; *United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976). According to Defendant, because the troopers were not "directly involved in the investigation that led to the search," nor were they in "close communication" with Agent Graber, they were not privy to the collective knowledge of the DEA's investigation into QRMP or to the DEA's surveillance of the Stratford Road house.

Defendant's arguments based on *Pasquarille*, *Perkins*, and *Woods* are without merit, because those cases do not require the type of relationship between law enforcement agencies that Defendant seeks to impose.[5] As soon as Agent Graber spoke to the Michigan state police and informed them of the DEA's investigation, the requisite relationship was established, and the troopers could stop Defendant's minivan. While Defendant claims that the collective knowledge doctrine does not apply because the troopers had no *prior* investigative relationship with the DEA, none of the cases she cites require a pre-established relationship among law enforcement agencies. In short, there is no merit to Defendant's claim that the troopers were not sufficiently involved in the DEA's investigation to impute collective knowledge.

The seminal cases establishing the collective knowledge doctrine support this conclusion. In *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560 (1971), a county sheriff in Wyoming issued a statewide dispatch relaying the arrest warrant for an

---

[5]*Pasquarille*, in particular, has been completely misconstrued by Defendant; the case actually *rejects* the notion that a direct investigative relationship is required. *See Pasquarille*, 20 F.3d at 689 (finding "unpersuasive" the argument that a "direct investigative relationship" is necessary to avail the collective knowledge doctrine).

individual suspected of a burglary.  *Id*. at 563.  Although the message went first through a state transmission network, was received by a different county's sheriff department, and then was relayed to the arresting police department, the Supreme Court imputed collective knowledge.  *Id*. at 568.  Likewise, in *United States v. Hensley*, 469 U.S. 221 (1985), the sole communication between the law enforcement bodies was a flyer issued by the investigating authority that notified fellow police departments that the defendant was wanted for a bank robbery.  A different police department independently discovered the defendant and performed a *Terry* stop on the basis of the flyer.  *Id*. at 233.  The Supreme Court nevertheless applied the collective knowledge doctrine.  Accordingly, we reject Defendant's argument regarding the type of law enforcement relationship required to apply the collective knowledge doctrine.

Defendant next contends that, to the extent that the troopers and Agent Graber were in contact prior to the traffic stop, the information relayed was *de minimis* such that no knowledge was actually collectively shared.  In support of this argument, Defendant relies heavily on this Court's opinion in *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008).  In *Blair*, this Court suppressed evidence recovered during a *Terry* stop that would have been valid had the supporting facts observed by the investigating officer—a hand-to-hand drug transaction—been communicated to the arresting officer prior to detaining the defendant.  *Id*. at 751–52.  In deeming the stop illegal, this Court specifically distinguished *Blair* from *Hensley*, reasoning that the *Hensley* flyer at least contained "reasonable, articulable facts that would justify a *Terry* stop," whereas the responding officer in *Blair* never received *any* information as to "why Blair should be stopped, or even that he should be stopped at all . . . . [T]he only information [he] received prior to the stop was that a car was leaving [a] suspect house." *Id*.

*Blair* proves that there may be instances in which the collective knowledge doctrine cannot be applied, because "the officer who conducted the *Terry* stop could not feasibly have been aware of [the] information essential to the reasonable-suspicion determination at the time he effected the stop." *Williams*, 2012 WL 1700454, at *6. Nevertheless, *Blair* does not establish a minimum on the amount of information that

must be communicated among officers to impute collective knowledge. Rather, *Blair* stands only for the proposition that an officer who acts independently of another officer's request, and who acts in ignorance of any information that would establish reasonable suspicion, is not entitled to claim collective knowledge after the fact.

Considering these principles, the collective knowledge doctrine clearly applies to this case. The record demonstrates that the troopers were not acting on their own initiative when they stopped Defendant. The troopers testified that they had no independent basis to target the minivan; rather, they did so based solely on Agent Graber's request. It is instructive that the troopers made no attempt to develop or to otherwise confirm the facts underlying the DEA's request, but instead objectively relied entirely on unverified information furnished to them by fellow law enforcement. Significantly, the troopers testified that Agent Graber's request was a fairly typical one and that they would have stopped the minivan in any event, even absent independent probable cause, based solely on the DEA's request.

Moreover, it is immaterial that the troopers were unaware of all of the specific facts that supported the DEA's reasonable suspicion analysis. The troopers possessed all the information they needed to act—a request by the DEA (subsequently found to be well-supported) that they execute the traffic stop in the expectation that illegal narcotics would be found in the vehicle. To be sure, the troopers' testimony at the suppression hearing was skeletal at best. However, the lack of detail reflected in the troopers' testimony was perhaps understandable given the urgency of the circumstances. Trooper Wise was only able to vaguely recall that he and his partner were informed that the minivan was part of "an ongoing investigation" by the DEA. Trooper Grubbs could not provide any specifics beyond his inference that "obviously there was something more to this vehicle tha[t] the DEA wanted." Agent Graber's testimony was somewhat more precise; however, he claimed only that the DEA provided the troopers with a "brief synopsis of what was happening" with the DEA's investigation and "limited . . . but significant details" explaining "why [the DEA] believed there would be narcotics in [Defendant's] vehicle." Although we would certainly prefer to see a better development

of the record, especially to the extent that such testimony has the potential to affect whether the proper scope of the stop was respected,  Defendant has made no such argument.  Moreover, and as explained further below, our independent review leads us to conclude that the troopers did not exceed the proper scope of the stop when they asked Defendant a few basic investigatory questions before searching her vehicle. *See Williams*, 627 F.3d at 253 (collecting similar cases).

Responding officers are entitled to presume the accuracy of the information furnished to them by other law enforcement personnel.  They are also entitled to rely upon the investigating officer's representations of reasonable suspicion, and to the extent applicable, whatever exigent circumstances are claimed to support a stop.  The interests of our law enforcement would be stifled without permitting such presumptions, and it is those interests that lie at the heart of the collective knowledge doctrine.  Any later contentions by a defendant that such presumptions were not justified, either because the investigating officer supplied false information or because he failed to act in good faith, may be subsequently reviewed by the court pursuant to a motion to suppress.  In doing so, the court's primary attention should remain on the investigating officer's actions and knowledge, rather than on the quantity or quality of information supplied to the responding officer.

The district court mischaracterized the record when it concluded that there was "no evidence" to show that "the minivan was stopped based on the DEA's investigation and collective knowledge."  The troopers clearly acted on the DEA's directive and executed the stop within the bounds of the DEA's reasonable suspicion.[6]  Accordingly, the collective knowledge doctrine applies and the traffic stop was valid.

---

[6]The fact that the troopers failed to note the DEA's involvement in their incident report is also without consequence.  "[T]he collective knowledge doctrine is unaffected by an officer's use of a cover story to disguise a stop as a mere traffic stop." *Williams*, 627 F.3d at 253 (citing *United States v. Chavez*, 534 F.3d 1338, 1341–42 (10th Cir. 2008) and *United States v. Ramirez*, 473 F.3d 1026, 1038 (9th Cir. 2007) (Kozinski, J., concurring)).

**III.     The Search of the Vehicle**

Having upheld the initial stop, we must next consider whether the search of Defendant's vehicle was permissible.  The government is correct that the search was justifiable under the automobile exception.

**A.     The Automobile Exception Applies**

Reasonable suspicion to perform a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the vehicle's occupants. *See Craig*, 198 F. App'x at 463.  Under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity.  *Smith*, 136 F.3d at 1074–75; *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)).  The automobile exception applies even in nonexigent circumstances and even when the officer's decision to stop the vehicle was pretextual. *See United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002); *Hill*, 195 F.3d at 264 (citing *Whren v. United States*, 517 U.S. 806, 812–13 (1996)).

In detaining a vehicle, an officer may make inquiries unrelated to the traffic stop, so long as those questions do not measurably prolong the detention and the detainee's responses are voluntary. *Everett*, 601 F.3d at 490; *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004).  An officer is permitted to use those responses as a means of confirming or dispelling his initial suspicions of criminal activity, so long as he does not embark on an unrelated sustained course of investigation. *Everett*, 601 F.3d at 495. "[Q]uestions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer" are the sorts of classic "context-framing" questions directed at the driver's conduct at the time of the stop that rarely offend our Fourth Amendment jurisprudence. *United States v. Stepp*, 680 F.3d 651, 662–63 (6th Cir. May 17, 2012) (citing *Everett*, 601 F.3d at 494–95).  Although evasive behavior and nervousness may

be considered as part of the probable cause analysis, nervousness alone is insufficient to establish probable cause. *Richardson*, 385 F.3d at 630; *Wardlow*, 528 U.S. at 124.

In the instant case, the troopers asked Defendant only the most basic of questions within the proper bounds of an investigative stop. Defendant, however, was unable to answer those questions. She could not supply adequate identification permitting her to operate a motor vehicle; she provided inconsistent answers about her travel plans; and her minivan smelled strongly of an odor commonly used to mask the scent of drugs. These observations, considered in their totality along with the facts that permitted the initial stop, established probable cause to search the minivan for controlled substances under the automobile exception.

### B.     Whether Defendant Consented to the Search

Although the parties only address the issue in passing, there is also a factual dispute about whether Defendant voluntarily consented to the search of her vehicle. When the government asserts that a search is justified by a defendant's consent, the government bears the burden of proving that, under the totality of the circumstances, the consent was "unequivocal, specific, and intelligently given, uncontaminated by duress and coercion." *United States v. Williams*, 754 F.2d 672, 674–75 (6th Cir. 1985) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)).

The district court, having found the initial stop invalid, never reached this issue. However, the magistrate judge described the disputed facts as follows:

> Trooper Wise testified that he asked Lyons for consent to search her vehicle and she said, "go ahead." According to Trooper Wise, this request happened prior to Lyons exit[ing] the vehicle. Trooper Grubbs testified that Trooper Wise told him that Lyons had consented to a search, but he did not hear the request or response. Trooper Grubbs also testified that Trooper Wise probably informed him that Lyons had consented to the search during the stop on Eight Mile Road. Defendant did not produce any evidence rebutting that testimony. She does suggest in her supplemental brief that her consent is in question because she was placed in handcuffs prior to the request for the search, but there [is] no

support for that argument in the evidence. This court finds Trooper Wise
to be credible on the question of consent and that the search was proper.

Because the district court did not determine this factual dispute, and the parties'
discussion is inadequate, we decline to address it.

## CONCLUSION

Because the DEA had reasonable suspicion to order the traffic stop and the
collective knowledge doctrine applied, the initial stop performed by the troopers was
valid. Upon detaining Defendant, the troopers obtained probable cause to search
Defendant's vehicle under the automobile exception. For these reasons, we **REVERSE**
and **REMAND** for further proceedings consistent with this opinion.