**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0414n.06

No. 18-6004

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |  |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| | ) | | |
| Plaintiff-Appellee, | ) | | |
| | ) | ON APPEAL FROM THE | |
| v. | ) | UNITED STATES DISTRICT | |
| | ) | COURT FOR THE WESTERN | |
| ERIC SCOTT KEELING, | ) | DISTRICT OF KENTUCKY | |
| | ) | | |
| Defendant-Appellant. | ) | | |
| | ) | | |

**FILED**
Aug 08, 2019
DEBORAH S. HUNT, Clerk

---

**BEFORE: GILMAN, SUTTON, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** A confidential informant told police that Eric Keeling would be driving a green truck to a certain house on a certain night to transport methamphetamine. The police, operating a narcotics task force in the area, surveilled the house and observed Keeling drive up to that certain house on that certain night in a green truck. When Keeling left, they followed him to another suspected drug house and, eventually, conducted a traffic stop. Police discovered that Keeling was armed during a pat-down and detained him. Their subsequent search of Keeling's truck revealed more guns and over 100 grams of methamphetamine.

After the district court denied his suppression motions, Keeling pled guilty to possession with intent to distribute methamphetamine, possession of a firearm in furtherance of a drug-trafficking offense, and possession of a firearm by a convicted felon, preserving the right to challenge the court's suppression ruling. On appeal, Keeling argues that the police lacked

reasonable suspicion to stop him and probable cause to justify the vehicle search. We find these arguments unpersuasive and affirm.

I.

A local task force began investigating methamphetamine trafficking in Nelson County, Kentucky, in 2014. The investigation led the task force to suspect that Keeling was manufacturing the drugs. A confidential source ("CS") tipped off the task force that Keeling would be transporting methamphetamine from Louisville to Chaplin, Kentucky on February 15, 2016. According to Michael Watts, a Nelson County narcotics detective, the CS previously provided reliable information in the course of the task force's investigation. This time, the CS informed the task force that Keeling was driving a green truck and would deliver a supply of methamphetamine to a particular house in Chaplin. The house belonged to Chris Evans, another person of interest in the task force's investigation. Based on a prior arrest of Evans, the task force had connected Evans and Keeling and believed they had a "close relationship." (R. 16, PID 44.) The task force suspected they were trafficking in methamphetamine together and that Keeling was a "key player" in the operation. (*Id.* at PID 45.)

Based on the CS's tip, the task force started surveilling Evans's "drug house" on the same day. (*Id.* at PID 44.) The task force installed a video camera on a pole across the street from Evans's house. The surveilling officers, including Watts, sat in an unmarked vehicle down the street and watched the house via live video feed on an iPad. Around 11:00 p.m., they saw Keeling drive up to the house in a green truck and go inside. Roughly twenty minutes later, Keeling emerged from Evans's house, got in the truck, and left. Watts perceived this time frame as significant because it gave Keeling "time to sit down and conduct business." (*Id.* at PID 49.) The officers tried to follow Keeling but lost him within minutes. They then drove past Johnny Janes's

house, a suspected drug house, and saw Keeling's green truck.  The task force had identified Janes as another person of interest in the investigation and as the father of Amanda Bivens, who they believed to be Keeling's girlfriend.  The officers watched Janes's house and, after twenty minutes, saw Keeling and someone else leave the house and get into the green truck.

Keeling drove toward the surveilling officers' vehicle.  When the officers pulled out in front of him, the car—without using any turn signal—made an "abrupt turn" and drove in the other direction.  (*Id.* at PID 53.)  Believing that Keeling (or the driver of the car) was "spooked" and aware of the surveillance, Watts radioed the officers in marked vehicles.  (*Id.*)

Marked patrol cars intercepted Keeling.  Officer Kyler Wright arrived first and activated his emergency lights.  Wright observed Keeling "immediately start[] to reach over towards the center floorboard of the vehicle." (*Id.* at PID 80.)  Thinking that Keeling was grabbing a weapon, Wright got out, drew his gun, and ordered Keeling to show his hands.  By that time, Officer A.J. Lewis had arrived.  When Lewis saw Keeling lower his right hand toward his waistline, Lewis also drew his gun.  The officers then ordered Keeling to put his hands back up, removed him from the truck, and handcuffed him.  Lewis conducted a pat-down of Keeling and felt a handgun in his right coat pocket.  Lewis secured the handgun and informed the other officers.  Another officer removed the passenger, who they identified as Bivens, and detained her.

With both Keeling and Bivens secured, officers turned their attention to Keeling's truck and initiated a "hands-on search" of the vehicle.  (*Id.* at PID 86.)[1]  In the center floorboard, they

---

[1] After the officers secured Keeling and Bivens but before the hands-on search of the truck, Wright walked a drug-sniffing canine named Zeus around the truck.  Wright testified that Zeus, trained to detect the presence of various narcotics, "indicated on the driver's side door area of the vehicle."  (R. 16, PID 84.)  Wright let Zeus inside the truck, and Zeus again alerted officers to the presence of narcotics—this time, on the center floorboard.  Wright put Zeus back into his patrol car.

As did the district court, we decline to consider Zeus's positive alerts in our analysis because the government provided no evidence of Zeus's training or certification to establish his reliability beyond Wright's statement that Zeus was "trained" to detect drugs.  (*Id.* at PID 81.)  The Supreme Court requires at least some proffer of a drug dog's reliability based on training or certification.  *See Florida v. Harris*, 568 U.S. 237, 244 (2013) (explaining that evidence

found a bag containing 109.2 grams of methamphetamine.  They discovered two firearms, one in the driver's side door and one behind the driver's seat.  Officers also found two boxes containing surveillance cameras, digital scales, and baggies.

A grand jury charged Keeling with (1) possession with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), (c)(1)(B)(i); and (3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[2]  Keeling moved to suppress the evidence found in his truck, and the district court denied his motion.  After a change of counsel, Keeling filed a second motion, which the district court also denied.

Keeling pled guilty pursuant to a Rule 11 plea agreement, preserving his right to appeal the district court's denial of his suppression motions.  The district court sentenced Keeling to a total term of 117 months' imprisonment—57 months' imprisonment each for Counts 1 and 3, to run concurrently, and 60 months' imprisonment for Count 2, to run consecutively to the terms for Counts 1 and 3.  Keeling now appeals the denial of his motions to suppress.

II.

Keeling argues that the district court erred in denying his motions to suppress because the police conducted the traffic stop without reasonable suspicion and searched his car without probable cause.  In assessing the denial of a suppression motion, we review the district court's

---

of a drug dog's certification or satisfactory completion of a training program may establish the dog's reliability and that a defendant must have an opportunity to challenge proffered evidence of reliability, either by cross-examination of the trainer or introduction of defendant's own fact or expert witness).  Further, the government has abandoned its argument that we should consider Zeus's alerts on appeal.

[2] The grand jury also charged Keeling, in a fourth count, of being a felon in possession of a firearm.  This count, later dismissed pursuant to Keeling's plea agreement, arose from an unrelated arrest in July 2016 when officers found a handgun in Keeling's vehicle.

findings of fact for clear error and its legal conclusions—including whether probable cause existed—de novo. *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018) (citing *United States v. Dunning*, 857 F.3d 342, 346 (6th Cir. 2017)). Whether reasonable suspicion existed is a mixed question of law and fact, which we also review de novo. *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012) (citing *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008)). Because the district court denied Keeling's suppression motions, we must view "all evidence in a light most favorable to the Government." *United States v. Jackson*, 682 F.3d 448, 452 (6th Cir. 2012) (quoting *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006)).

### A. Traffic Stop

Keeling first challenges the legality of the traffic stop, arguing that the officers lacked reasonable suspicion to conduct it. Specifically, he asserts that the government failed to establish the reliability of the CS, whose tip led the task force to surveil and follow Keeling. We disagree.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. Fourth Amendment protections extend to brief investigatory stops that fall short of traditional arrest. *See Terry v. Ohio*, 392 U.S. 1, 19 (1968); *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). A traffic stop is also a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Evidence procured from an illegal traffic stop must be suppressed as fruit of the poisonous tree. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963). When police have reasonable suspicion of an ongoing crime, they may legally make a traffic stop. *Id.* (citing *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)).

We measure the reasonableness of a traffic stop under the standards that apply to investigatory stops, as set forth in *Terry v. Ohio* and its progeny. *Lyons*, 687 F.3d at 763 (citing

*United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010)). Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)). Under this standard, an officer may conduct a traffic stop if he or she "possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts[.]" *Id.* (quoting *Dorsey*, 517 F.3d at 395). We assess reasonable suspicion under the totality of the circumstances. *Id.* We therefore consider "all of the information available to law enforcement officials at the time." *Id*. (quoting *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007)). We look at the aggregate, not each factor or consideration in isolation. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (explaining that, under *Terry*, courts must avoid "this sort of divide-and-conquer analysis"); *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (explaining that even if each individual circumstance or factor suggests innocent conduct, the circumstances "taken as a whole" may provide reasonable suspicion). We also recognize that "[o]fficers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Perez*, 440 F.3d at 371 (quoting *Arvizu*, 534 U.S. at 273).

A tip—anonymous or not—may furnish reasonable suspicion necessary to justify an investigatory stop. *Alabama v. White*, 496 U.S. 325, 332 (1990); *Illinois v. Gates*, 462 U.S. 213 (1983). Such a tip must pass muster under *Gates*, which directs us to consider an informant's "veracity," "reliability," and "basis of knowledge." 462 U.S. at 230. We have also recognized "subsequent corroboration of the [informant's] tip," *United States v. Smith*, 182 F.3d 473, 478 (6th Cir. 1999), and whether an informant is known or anonymous, *United States v. May*, 399 F.3d 817,

823 (6th Cir. 2005), as relevant factors. These considerations are not independent requirements; instead we consider them under the totality of the circumstances. *Gates*, 462 U.S. at 230.

Keeling argues that the government failed to provide sufficient evidence of the CS's reliability. He cites *United States v. Rodriguez-Suazo*, 346 F.3d 637 (6th Cir. 2003), and *United States v. Hunter*, 333 F. App'x 920 (6th Cir. 2009), for the proposition that, to establish reliability, the government must offer evidence of "how many times that source had provided information in the past, the nature of that information, or whether that information had actually led to any arrests or convictions." (Appellant's Br. at 14.) Keeling also argues that the CS undermined his own reliability by not answering his phone when the task force tried to follow-up on the earlier tip.

Although Keeling is correct that the government "must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form." *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005); *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001) ("[T]he affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable."). Evidence that an informant was known to the police and had provided reliable information in the past can establish a track record sufficient to show reliability. *Adams v. Williams*, 407 U.S. 143, 146–47 (1972). As to basis of knowledge, even "scant evidence that the tipster had" firsthand knowledge may support a reliability finding. *Navarette v. California*, 572 U.S. 393, 399 (2014). Independent corroboration of a tip further augments an informant's reliability. *Id.* at 398 ("By accurately predicting future behavior, the tipster demonstrated a special familiarity with [the defendant]'s affairs, which in turn implied that the tipster had access to reliable information about that individual's illegal activities." (citation and internal quotation marks omitted)).

At Keeling's suppression hearing, the police officers did not offer much information regarding the CS. Officer Watts confirmed that the CS was a known informant for the task force and had previously provided reliable information related to their investigation in Nelson County. Watts also stated that the CS was "connected to the drug world." (R. 16, PID 65.) It is a close call whether these vague and conclusory statements, by themselves, would establish the reliability of the confidential informant. However, the task force's surveillance of Keeling corroborated several details of the CS's tip. The CS predicted that Keeling would be driving a green truck to Evans's house on February 15, 2016. Keeling did exactly this, corroborating the tip. *Navarette*, 572 U.S. at 398. That these details can be consistent with innocent behavior does not defeat the value of corroboration in our analysis. *Cf. Arvizu*, 534 U.S. at 274 (noting that observations susceptible to innocent explanations are still relevant considerations and may collectively amount to reasonable suspicion); *Perez*, 440 F.3d at 371 (same). Under the totality of the circumstances, we find that the CS's tip passes muster under *Gates*'s reliability standard.

A reliable, independently corroborated tip may alone suffice to establish reasonable suspicion. *See United States v. Mullins*, 47 F.3d 1171, 1995 WL 66624, at *5–6 (6th Cir. 1995) (Table) (holding that a traffic stop "was supported by a reasonable suspicion; namely, an independently corroborated tip from a confidential informant," which alerted police that two persons in a red van would be traveling to the home of a known drug dealer to purchase cocaine). Here, however, other information learned through the officers' investigation supplemented their reasonable suspicion that "criminal activity may [have been] afoot," *see Terry*, 392 U.S. at 30— specifically, that Keeling was trafficking in methamphetamine.

The officers observed Keeling drive a green truck to the drug house specified by the CS, then travel to a different drug house immediately thereafter. At each location, Keeling stayed for

approximately twenty minutes—a period of time that the officers testified was consistent with drug transactions. And while "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), such association is a relevant factor in determining reasonable suspicion. *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005). On top of that, the officers observed Keeling's car make an erratic, abrupt turn once he had left the second drug house and came across the unmarked patrol car. The officers knew of Keeling's criminal history, including a previous attempt to evade police, and had already identified him as a person of interest in the task force's ongoing investigation. Looking at these facts in the aggregate, the officers had "a particularized and objective basis" to believe that Keeling was in the process of trafficking in methamphetamine. *See Lyons*, 687 F.3d at 763 (quoting *Dorsey*, 517 F.3d at 395). We therefore conclude that the stop was supported by reasonable suspicion and thus valid under the Fourth Amendment.

## B. Vehicle Search

Having upheld the initial stop, we now turn to the officers' warrantless search of Keeling's truck. The Fourth Amendment imposes two requirements for searches. *Kentucky v. King*, 563 U.S. 452, 459 (2011). First, they must be reasonable. *Id.* Second, absent an applicable exception, they must be supported by a warrant issued on the basis of probable cause. *Id.* A warrantless search is per se unreasonable and thus violates the Fourth Amendment unless it is justified by one of "a few specifically established and well-delineated exceptions." *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)).

The automobile exception to the warrant requirement is one such exception. It permits "an officer [to] perform a warrantless search of a detained vehicle [if] the officer ha[s] probable cause

to believe the vehicle contains contraband or evidence of criminal activity." *Lyons*, 687 F.3d at 770 (citing *Smith v. Thornburg*, 136 F.3d 1070, 1074–75 (6th Cir. 1998)). This exception rests on a vehicle's special status as readily mobile and pervasively regulated. *Collins v. Virginia*, 138 S. Ct. 1663, 1669–70 (2018). "When these justifications for the automobile exception 'come into play,' officers may search an automobile without having obtained a warrant so long as they have probable cause to do so." *Id.* at 1670 (citing *California v. Carney*, 471 U.S. 386, 392–93 (1985)).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. To measure for probable cause, we ask "whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)). We evaluate whether the facts satisfy "this practical and common-sensical standard" by looking at "the totality of the circumstances." *Florida v. Harris*, 568 U.S. 237, 244 (2013).

Here, the totality of the facts and circumstances known to the officers before they searched Keeling's truck were sufficient to establish a fair probability that the officers would find contraband or evidence of drug-trafficking therein. *See Cope*, 312 F.3d at 775.

We begin with the CS's tip and the officers' independent observations that corroborated it. "Probable cause may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers." *Lumpkin*, 159 F.3d at 986; *United States v. Padro*, 52 F.3d 120, 123–24 (6th Cir. 1995) (upholding a warrantless search of a vehicle where the officer had probable cause to believe the car contained cocaine based on a corroborated anonymous tip).

In *United States v. Padro*, we found that a highly-detailed, anonymous tip, corroborated by an officer's independent observations, supported a finding of probable cause. 52 F.3d at 123. There, an unknown caller told police that two men would be transporting cocaine in a gray Buick from Rochester, New York, to Cleveland, Ohio, one evening. *Id.* at 121. The caller also provided a license plate number and indicated that the car had a secret compartment in the rear seat. *Id.* One officer, who had observed a suspected drug dealer driving and "apparently selling drugs from that Buick" on several occasions, recognized the vehicle description. *Id.* at 122. On the night in question, police surveilled the highway, spotted the car, and followed it. *Id.* Officers then stopped the vehicle, detained the driver and passenger, and, after seeing a protruding panel near the rear seat, searched the vehicle. *Id.* This court held that the officers had probable cause to conduct the warrantless search based on the specific, corroborated facts provided by the tipster and the officers' independent information and observations, "which suggested that the vehicle was involved in criminal activity." *Id.* at 123. Here, not only do we have a similar, corroborated tip, but the officers independently observed Keeling stop at two different known drug houses before they stopped him—a fact that the officers did not have in *Padro*. In addition, the tipster here was known to the police.

After officers pulled Keeling over, they ordered him to show his hands. Lewis testified at the suppression hearing that Keeling, in defiance of the order, dropped his right hand and reached for his waistline. We have said that "[f]urtive movements made in response to a police presence may also properly contribute to an officer's suspicions." *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006), *abrogated on other grounds by Cradley v. United States*, 891 F.3d 659, 671 (6th Cir. 2018); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). Keeling argues that his hand movements—after the officers ordered him to raise his hands—could be explained by

"innocent reasons" such as shifting the gear into park. (Appellant's Br. at 21.) Maybe so, but a possible innocent explanation for his hand movements does not render them irrelevant to the probable-cause determination. *See Arvizu*, 534 U.S. at 274 (noting that observations susceptible to innocent explanations are still relevant considerations); *Perez*, 440 F.3d at 371 (same). Recognizing that officers may draw inferences based on their own training and experience and "all of the information available" to them, it was reasonable for the officers to infer Keeling, a known felon who was thought to be armed, might be reaching for a gun when he moved his right hand down. *Humphrey*, 482 F.3d at 846.

When the officers approached Keeling in his truck, knowing that he was a convicted felon and possibly armed, they conducted a protective frisk that Keeling does not challenge. The officers' frisk revealed a gun, which we have recognized as a "tool[] of the drug trafficking trade." *United States v. Wilson*, 27 F.3d 1126, 1133 (6th Cir. 1994) (quoting *United States v. Gahagan*, 865 F.2d 1490, 1499 (6th Cir. 1989)).

In total, the facts known to the officers—including the initial corroborated tip, Keeling's visiting known drug houses, his furtive hand movements in response to police presence, and the possession of a gun on his person—created a "fair probability" that they would find contraband or evidence of drug trafficking in Keeling's truck.[3] *See Cope*, 312 F.3d at 775. Thus, the officers had probable cause to conduct the warrantless search.

---

[3] Keeling urges us to ignore the gun found on his person during the pat-down because "it is not clear from the record when officers actually placed Mr. Keeling under arrest[.]" (Appellant's Br. at 21.) His argument, however, misses the mark. If the sequence of events was undefined as Keeling suggests, that might be relevant to the search-incident-to-arrest exception to the warrant requirement. But we are asking whether the officers had probable cause to search his vehicle under the automobile exception, wholly separate from a search incident to arrest. Moreover, it is clear from the record that the officers searched Keeling's truck only *after* they discovered the gun on Keeling and placed him in handcuffs. This sequence of events supports probable cause, not undermines it.

III.

Because the district court did not err in its reasonable-suspicion and probable-cause determinations and properly denied Keeling's suppression motions, we affirm.