NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0766n.06

No. 13–1824

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff – Appellee, | ) | Oct 07, 2014 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| JERON GASKIN, | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| Defendant – Appellant. | ) | MICHIGAN |

**BEFORE: DAUGHTREY, McKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Jeron Gaskin was convicted of conspiracy to possess and distribute controlled substances, 21 U.S.C. §§ 841(a)(1) and 846, and two counts of possession with intent to deliver a controlled substance, 21 U.S.C. §§ 2 and 841(a)(1). The district court sentenced him to 360 months' imprisonment. On appeal, Gaskin argues that the district court erred in denying his motion to suppress evidence seized after a traffic stop, that there was insufficient evidence to convict him of one possession charge, and that his sentence is constitutionally infirm. We AFFIRM.

## I.

Gaskin, a founding member of an east-Detroit street gang known as the "Hustle Boys," was indicted along with ten co-defendants (collectively, the Group) for trafficking controlled substances. The seven male members of the Group were affiliated with the "Hustle Boys," and the remaining four members are females who were employed as drug mules.

Originally, the Hustle Boys earned money by hosting parties, but with success came rival gangs, leading the Hustle Boys to engage in "shootings, robberies, [and] things of that nature." The Hustle Boys socialized, packaged narcotics, and planned various trafficking activities in Gaskin's Detroit residence, known as the "Hustle House." Generally, the Group would acquire prescription pills or guns in Michigan and then "go out of town and traffic drugs or guns" in southern Ohio and West Virginia. Gaskin recruited individuals to join the Group.

To conceal the drugs when "going out of town," the females in the Group acted as mules by placing pills, wrapped in condoms, in their vaginas. Gaskin collected the money for any pills trafficked (usually $10,000 or more per trip), and the female mule made up to $600 per trip, depending on who she was and how much she was able to carry. Typically, more than one female mule accompanied Gaskin on these trips.

Around 8:30 p.m. on August 6, 2010, co-defendant Pinkie Lewis drove Gaskin and co-defendants Vonda Hopkins and D'Marco Hodge on a trip "out of town." Just north of Lucasville, Ohio, State Highway Patrol Trooper Nicholas Lewis (Lewis), who was parked facing west in a highway cross-over, observed Pinkie drive by without headlights on. Just before pulling her over, Lewis saw Pinkie's headlights turn on; nevertheless, Lewis stopped Pinkie for driving after sunset without her headlights on, a minor misdemeanor in Ohio.[1] Shortly thereafter Trooper Theresa Mikesh (Mikesh)—who also saw Pinkie's car and agreed that she had been driving without her headlights on—arrived on the scene with her drug-sniffing dog, who subsequently alerted that drugs were in Pinkie's car.

Lewis approached the front passenger, Hopkins, a minor, who gave Lewis false identification and admitted that she had been smoking marijuana. Mikesh detained Hopkins,

---

[1] Ohio traffic laws require a driver, *inter alia*, to have his headlights on from "sunset to sunrise." Ohio Revised Code § 4513.03. The statute does not define how "sunset to sunrise" is to be determined.

patted her down, and felt a hard object protruding from her groin. Before being placed in Mikesh's cruiser, Hopkins told Mikesh that she had 300 to 400 pills in her vagina.

The remaining passengers in Pinkie's car, including Gaskin, were placed in Lewis's cruiser. While in Lewis's cruiser, Pinkie removed a condom containing pills from her groin area and hid it behind the cruiser's backseat. It was ultimately discovered that Hopkins was carrying 602 80-milligram OxyContin pills and Pinkie 437 of the same pills.

Six months after the stop, Gaskin was arrested and found with thirty-five oxymorphone pills. After his motion to suppress evidence flowing from the traffic stop was denied, he was tried and convicted of the conspiracy charge and two possession charges[2] and sentenced to an aggregate sentence of 360 months in prison and three years' supervised release.

## II.

Gaskin presents three challenges to the district court's denial of his motion to suppress. First, he asserts that Lewis did not have probable cause to initiate the stop, and therefore the court erred in denying Gaskin's motion to suppress. Second, he argues that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to produce a video recording of the traffic stop. Finally, he argues that the Government violated *Youngblood v. Arizona*, 488 U.S. 51 (1988), by failing to preserve the video of the traffic stop.

When reviewing a district court's denial of a motion to suppress, we review factual findings for clear error and conclusions of law *de novo*. *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004). In so doing, we review the evidence "in the light most likely to support the district court's decision" and give "due weight" to inferences drawn by the district court. *Id.*; *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). "A factual finding is

---

[2] The conspiracy count was based on the drug distribution activities of the Hustle Boys and their "mules." One possession count was based on the pills possessed by Pinkie and found during the traffic stop; the second possession charge was based on the pills found on Gaskin when he was arrested.

clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008) (citation and quotation marks omitted).

"This circuit has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Id*. at 748. "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment," "regardless of whether this was the *only basis* or merely one basis for the stop." *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (citation and quotation marks omitted); *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005).

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. A *Brady* violation occurs when: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the state suppressed the evidence, "either willfully or inadvertently"; and (3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Regardless whether a defendant requested the evidence, "favorable evidence is material, and constitutional error results from its suppression by the [prosecution], if there is a *reasonable probability that*, had the evidence been disclosed to the defense, *the result of the proceeding would have been different*." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (emphasis added). We review the "denial of a motion for [a] new trial based on *Brady* violations under an abuse of

discretion standard." *United States v. Graham*, 484 F.3d 413, 416 (6th Cir. 2007). However, "the district court's determination as to the existence of a *Brady* violation is reviewed *de novo*." *Id*. at 416–17.

## A.

Gaskin sought suppression of the pills seized during the traffic stop, arguing that Lewis lacked probable cause to stop the car because either the sun had not yet set or the car's lights were on.[3] At the evidentiary hearing, Lewis testified nineteen times that the sun had set. Gaskin's expert, Ken Glaza, stated that "official" sunset occurred after the traffic stop, but acknowledged that "you have to actually be there to determine when the sun sets," partially because the local topography could affect the time of sunset.[4] In closing argument, Gaskin's counsel conceded that it was unclear whether the car's lights were on, but argued that this is irrelevant because sunset is measured "objectively" and had not yet occurred.

The district court denied Gaskin's motion to suppress, finding that "[Pinkie's] vehicle did not have its lights on when Trooper[s] Lewis and Mikesh first observed the vehicle," and that "[b]oth Trooper[s] Lewis and Mikesh believed that the sun had set and that the visibility was such that the lights were required to be on." The district court concluded that "any mistake of fact the Troopers may have made [regarding sunset] was 'reasonable' and 'd[id] not negate probable cause.'"

The Troopers' testimony adequately supports the district court's factual findings and we are not left with a definite and firm conviction that a mistake has been made. Nor did the district

---

[3] Gaskin makes a passing comment that Lewis pulled Pinkie over because of the car occupants' race. However, the district court found credible Lewis's testimony that he could not see the car's passengers (and thus did not know their race).

[4] For purposes of this hearing, the parties defined sunset as "after the upper edge of the disc of the sun has dropped below the visible horizon." The term is undefined in Ohio's Traffic Code. Lewis and Mikesh both testified that Lucasville, Ohio, is surrounded on both sides by large hills, and nestled in a river valley.

court err in its legal conclusion that because any mistake of fact the Troopers may have made regarding sunset was reasonable, it would not negate probable cause.

Here, the question is not whether Pinkie was *actually* violating the Ohio Traffic Code when she was driving without her headlights on; rather, it is whether Lewis *reasonably believed* that Pinkie was violating the Ohio Traffic Code. *See United States v. Hughes*, 606 F.3d 311, 320 (6th Cir. 2010); *see also United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment."). Lewis's reasonable belief that Pinkie was driving without headlights after sunset satisfies probable cause for the traffic stop, even if he was technically incorrect as to the time of sunset. *See Hughes*, 606 F.3d at 320. Thus, the district court properly denied Gaskin's motion to suppress based on a purported lack of probable cause.

**B.**

Gaskin argues that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to produce a video recording of the traffic stop that would have shown that the sun had not yet set. Assuming *arguendo* that *Brady* applies to suppression hearings, *see United States v. Taylor*, 471 F. App'x 499, 520 (6th Cir. 2012), Gaskin has not shown that a *Brady* violation occurred.

Gaskin argues that Lewis's DVR recording would have shown that the sun had not yet set when Lewis stopped Pinkie, that this would establish that the traffic stop was invalid, and that the evidence should be suppressed and the charge dismissed based on the failure to produce this exculpatory evidence.

Even assuming that the DVR recording was "favorable to the accused," Gaskin cannot prove a *Brady* violation because he cannot show prejudice, i.e., that there is a reasonable

probability that the result of the hearing would have been different if the tape had been produced. *Strickler*, 527 U.S. at 282. The issue is whether Lewis *reasonably believed* that Pinkie was driving without headlights after sunset. Given the testimony, it is unlikely that the video would have caused the district judge to conclude anything other than that Lewis reasonably believed sunset had occurred.

## C.

Gaskin also argues that the Government committed a due process violation under *Youngblood v. Arizona*, 488 U.S. 51 (1988), by failing to preserve Lewis's DVR recording of the traffic stop. This argument fails because Gaskin has not shown that any failure to preserve evidence was done in bad faith. *See Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) ("the failure to preserve this 'potentially useful evidence' does not violate due process 'unless a criminal defendant can show bad faith on the part of the police'" (quoting *Youngblood*, 488 U.S. at 58)).

In Ohio, Troopers typically generate audio and video recordings of traffic stops through either DVR or VHS. Once a Trooper with DVR technology activates his cruiser's emergency lights, an external memory card saves the recording from one minute prior to the lights being turned on until the lights are turned off (a manual override also appears to exist). The older VHS technology starts recording only when a Trooper turns the cruiser's emergency lights on; it does not capture the one minute prior to the lights being activated.

During Gaskin's traffic stop, Lewis's DVR recording system appeared to be working, but his memory card malfunctioned, was full, or otherwise failed to save the recording. Lewis discovered that his memory card malfunctioned only after returning to Highway Patrol headquarters and trying to watch the tape with his supervisor. The network administrator issued Lewis a new memory card and apparently disposed of the old one. There is no indication that

this was outside of Highway Patrol protocol or otherwise suspicious. Mikesh's VHS system operated as designed, although a few audio transmissions were "broken" due to a faulty microphone cord. The Government provided Mikesh's tape to Gaskin.

Lewis himself wanted to view and listen to the recording, believing it would have allowed him to hear the conversation that took place when Pinkie removed the pills she was carrying and concealed them in the backseat of his patrol car. However, as confirmed by Lewis's supervisor, the memory card in Lewis's cruiser did not save the recording. Once Lewis discovered this, he followed Highway Patrol policy and informed his supervisor of the malfunction. Further, the Government produced the VHS recording from Mikesh's vehicle, which contained evidence tending to exculpate other members of the Group, leading the district court to question why Mikesh's video would have been produced had the Government been acting in bad faith. Because there is nothing in the record to suggest that Lewis or the Government was acting in bad faith in failing to produce the video, the district court's finding that the Government was not in bad faith is not clearly erroneous.

## III.

Gaskin argues that there was insufficient evidence to convict him of possessing, with the intent to distribute, the pills found on him when he was arrested. When reviewing the sufficiency of the evidence, this court considers whether "any rational trier of fact could find the elements of the crime beyond a reasonable doubt," and, in so doing, this court "view[s] the evidence in the light most favorable to the prosecution, . . . giving the government the benefit of all inferences that could reasonably by drawn from the testimony." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 589 (6th Cir. 1999); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not

remove every reasonable hypothesis except that of guilt." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005).

To convict Gaskin of Count III, the Government had to prove that Gaskin "knowingly or intentionally . . . manufacture[d], distribute[d], or dispense[d], or possess[ed] with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Gaskin concedes that he had thirty-five oxymorphone pills—a schedule II controlled substance—in his waist band when he was arrested, but argues that there was no evidence that he possessed the pills with the intent to distribute them. We disagree.

Pinkie testified that a typical transaction for these types of pills involved between ten to fifty pills. Gaskin did not have a prescription for oxymorphone and was concealing the pills when they were discovered, and Gaskin's entire livelihood was financed and premised on distributing controlled substances. To be sure, Pinkie testified that Gaskin abused prescription pills himself, from which the jury could have inferred that the pills may have been for his personal use. However, viewing the evidence in the light most favorable to the Government, a rational trier of fact could conclude that Gaskin possessed the oxymorphone with an intent to distribute it. The Government introduced sufficient evidence to convict Gaskin of Count III.

## IV.

Gaskin's final arguments relate to his sentence. Criminal sentences are reviewed for both procedural and substantive reasonableness. A sentence is procedurally unreasonable if the district court improperly calculated the guidelines range, failed to treat the guidelines as advisory and not binding, failed to consider the § 3553(a) factors and adequately explain the chosen sentence, or failed to reasonably determine the facts. *United States v. Morgan*, 687 F.3d 688, 693 (6th Cir. 2012). We review claims of error in sentencing with differing standards depending

on whether the alleged error was properly preserved. *United States v. Bostic*, 371 F.3d 865, 870–71 (6th Cir. 2004). If preserved, we review for abuse of discretion; if not preserved, we review for plain error. Claims of procedural error are further governed by the *Bostic* rule. If a sentencing court asks the question required by *Bostic*—whether there are any objections not previously raised—and the party challenging the sentence on appeal fails to object, we will review the unpreserved objection for plain error. *Morgan*, 687 F.3d at 694; *United States v. Berry*, 565 F.3d 332, 340 (6th Cir. 2009) ("Berry's claim is reviewed for plain error because after the district court pronounced the sentence and asked if Berry had any objections, defense counsel answered in the negative."). But if the *Bostic* question is not asked, we review for abuse of discretion.

## A.

Gaskin argues that he was deprived of due process when he pleaded not guilty without being warned that the district court could order that his sentences run consecutively. At the beginning of the sentencing proceeding, Gaskin told the district court:

> First, I would like to let you know I was never aware going through this trial that I even had—that they can even go over 20-year maximum. I never signed nothing saying anything about no concurrency, consecutive sentence. I was never told, I never signed nothing. If I was aware of that, I wouldn't have a problem with whatever they was trying to give me today. . .

We will therefore review for abuse of discretion.

In this court, "there is no requirement . . . that the court explicitly admonish a defendant that a sentence may be imposed consecutively." *United States v. Opina*, 18 F.3d 1332, 1334 (6th Cir. 1994) (citing *Paradiso v. United States*, 482 F.2d 409 (3d Cir. 1973)). Further, both Gaskin and his counsel signed a document outlining the potential penalties. Although this document did not warn of consecutive sentences, it did not imply in any way that the sentences would run

concurrently. Moreover, Gaskin did not claim that he would have accepted a plea offer had he been aware of the potential for consecutive sentences. Rather, he stated he did not initially accept a plea agreement because he thought it would help other members of the Group, and he later refused to plead guilty because he was not willing to accept a seventeen-year sentence. We conclude that Gaskin has not shown that the failure to specifically advise him of the potential for consecutive sentences deprived him of due process.

**B.**

Gaskin next contends that the district court failed to adequately explain its rationale for imposing consecutive sentences. In certain circumstances, a district court has discretion to impose concurrent or consecutive sentences. 18 U.S.C. § 3584(a). In exercising this discretion, the district court must consider factors set forth in 18 U.S.C. § 3553(a), but it need not expressly address every factor. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006). If, after assessing the crimes committed, the district court determines that "the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." *See* U.S. Sentencing Guidelines Manual § 5G1.2(d). Further, when a sentence is imposed within the applicable Guidelines range, and there is no argument for departure or variance, the district court need not explicitly state that it has considered and rejected each of defendant's arguments. *Rita v. United States*, 551 U.S. 338, 357 (2007).

Here, the Guidelines provided for a sentence of life imprisonment, but the potential sentence was limited by each count's statutory maximum, to an aggregate of 720 months. The district court sentenced Gaskin to 240 months in prison (statutory maximum sentence) for the

conspiracy, 120 months in prison (half the statutory maximum) for the OxyContin seized during the traffic stop, and 240 months in prison (maximum sentence) for the oxymorphone seized when he was arrested. The district court imposed the first two sentences to run consecutively, with the third sentence to run concurrently with the first, resulting in an aggregate 360-month sentence, half the maximum sentence allowed under the Guidelines.

The longest sentence available for any of Gaskin's convictions was 20 years (240 months). However, anything less than 360 months, according to the district court, "would not serve the purposes of this sentence, particularly to provide just punishment and reflect the seriousness of the offense." The district court stated that it imposed the sentence to deter Gaskin and others from engaging in similar activity in the future and wanted the "sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." The district court thus concluded that consecutive sentences were necessary to impose a sentence that adequately addressed the offense. *See* Guidelines § 5G1.2(d). This was a reasonable conclusion, adequately explained.

## C.

Gaskin also challenges the district court's decision to enhance his sentence for being a leader or organizer of the Group. An enhancement under Guidelines § 3B1.1 "depends on a number of factual nuances that a district court is better positioned to evaluate"; thus, deferring to the trial court's judgment "whether someone is or is not a 'leader' of a conspiracy" is appropriate. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013).

Under the Guidelines, "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the base offense level] by 4 levels." Guidelines § 3B1.1. "Factors the court should consider include the exercise

of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id*. at Appl. Note 4. Gaskin does not challenge that the Group consisted of five or more individuals, he simply argues that the district court should not have found that he was an organizer or leader.

There is ample support for the district court's decision. Pinkie and Hopkins testified that the females worked for, and would carry pills for, Gaskin. Gaskin's residence—the Hustle House—was the Group's central meeting place in Detroit, Gaskin took a much larger portion of the profits from the trafficking trips, and Gaskin recruited individuals to join the Group. This evidence suggests that Gaskin held a leadership position within the Group. The Government need not establish each factor set out in Application Note 4; it is enough that the district court's finding that Gaskin was the organizer or leader of the Group is reasonable on the record. *See Washington*, 715 F.3d at 983.

## D.

Gaskin's final argument is that his 360-month sentence is cruel and unusual in violation of the Eighth Amendment. We review an Eighth Amendment challenge to a sentence *de novo*, reviewing the district court's underlying factual determinations for clear error. *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009).

The Eighth Amendment precludes "cruel and unusual punishments." U.S. Const. amend. VIII. "Embodied in the Constitution's ban on cruel and unusual punishments is the precept of justice that punishment for crime should be graduated and proportioned to the offense." *Graham v. Florida*, 560 U.S. 48, 59 (2010). We consider all the circumstances of a case to determine

whether the sentence is unconstitutionally excessive, and begin by comparing the gravity of the offense and the severity of the sentence. *Id.* at 60 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (opinion of Kennedy, J.)). We must give "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as the discretion that trial courts possess in sentencing convicted criminals." *Solem v. Helm*, 463 U.S. 277, 290 (1983). We afford a sentence within the properly calculated Guidelines range "a rebuttable presumption of reasonableness," *Williams*, 436 F.3d. at 708, because it "reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case," *Rita*, 551 U.S. at 347.

Gaskin's base offense level was 34 but he received enhancements for possessing illegal guns, his residence being headquarters for the trafficking scheme, involving a minor, intimidating a witness, and being an organizer or leader.[5] Cumulatively, this resulted in an offense level of 44, but the Guidelines capped the level at 43. With a category IV criminal history,[6] this resulted in a Guidelines sentence of life imprisonment, which was reduced to the statutory maximum of sixty years.

The district court sentenced Gaskin to 30 years in prison, followed by three years of supervised release. Given the circumstances of Gaskin's offenses, his criminal history, and the deference due to Congress and the district judge, Gaskin's 30-year sentence is neither disproportionate nor cruel and unusual.

---

[5] Other Group members were arrested on March 1, 2010, with 422 OxyContin pills. This led law enforcement to search the Hustle House on June 7 and 9, 2010; they found seven handguns, two assault rifles, 15 80-milligram OxyContin pills, and $5,690.00.

[6] Gaskin's criminal history includes assaulting a police officer, illegally concealing weapons, resisting and obstructing the police, and domestic violence. He also received negative remarks from his time in pretrial detention stemming from a fight.

**V**.

For the foregoing reasons, we AFFIRM.